Entered on Docket
January 02, 2011
August 02, 2011
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes the
Memorandum Decision of the Court.
Signed July 30, 2010

_____
Roger L. Efremsky
U.S. Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 05-53243-RLE |
| AVON TOWNHOMES VENTURE, | Chapter 7 |
| Debtor. | |

**MEMORANDUM DECISION REGARDING
COURT'S ORDER TO SHOW CAUSE**

Before the Court for decision is the Court's Order to Show Cause, which was entered on May 15, 2008, as Docket #222 (the "OSC"). The Court conducted evidentiary hearings on the OSC on July 25, 2008, August 22, 2008, September 10, 2008, September 24, 2008, October 6, 2008, October 15, 2008, October 27, 2008, October 30, 2008 and December 15, 2008. The Court received evidence and heard testimony from James McClenehan ("Mr. McClenehan"), Raymundo Lujano ("Mr. Lujano"), Joe Guerra ("Mr. Guerra"), Robert Jaramillo ("Mr. Jaramillo"), Samuel Goldstein ("Mr. Goldstein"), Stanley Zlotoff ("Mr. Zlotoff") and Nanette Dumas ("Ms. Dumas"). The Court also reviewed the papers filed by the parties following the conclusion of the December 15, 2008 hearing.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    The following constitutes the Court's Findings of Fact and Conclusions of Law, pursuant

2    to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

3    **I.    <u>INTRODUCTION</u>**

4    This case started out simple; it was a typical single asset bankruptcy case in which

5    Debtor, Avon Townhomes Venture, sought to sell its sole asset - a parcel of partially developed

6    real property in Lathrop, California.  A motion to sell was filed, a hearing was held, and the sale

7    was approved.  However, the sale and this case became complicated, expensive, and time

8    consuming due to the dishonesty of the participants in the sale and the mismanagement of the

9    case by its professionals.

10   Specifically, when Debtor's principal, Mr. Guerra, filed a declaration in connection with

11   the sale, stating that he had no relationship or connection with the proposed buyer (Metricz), he

12   was not telling the truth.  In fact, he was orchestrating every side of the sale, including, but not

13   limited to, controlling Metricz and having his son make $125,000 in required non-refundable

14   deposits for the purchase.  Further, for reasons that are not entirely clear to the Court, Mr. Guerra

15   was able to convince the real estate agent/loan broker (Mr. McClenehan), Metricz's alleged

16   principal (Mr. Lujano), and Metricz's alleged president (Mr. Jaramillo) to go along with and

17   advance the fiction that the Property was being purchased by an independent third party.  All the

18   while, Debtor's counsel (Mr. Zlotoff), turned a blind eye to the irregularities and inconsistencies,

19   while disregarding specific directives in the Court's order approving the sale.

20   Even when the trustee, Mohamed Poonja, was appointed and began investigating the

21   transaction, the parties held firm to the fictions they had created regarding the sale.  Metricz

22   hired Mr. Goldstein, who, because he had a prior relationship with Mr. Guerra and was because

23   he was representing Mr. Guerra in unrelated matters at the time, also seemed intent on

24   perpetuating the fiction that Metricz had purchased the Property and that Mr. Guerra had no

25   connection with the sale or with Metricz.  This led directly to the trustee's and his counsel's

26   expenditure of hours upon hours of time and expense, in an attempt to figure out what really

27   happened.  Ultimately, the trustee was left with no choice but to bring the matter to the Court,

28

1  which issued the OSC and conducted nine days of evidentiary hearings in an attempt to find out

2  the truth.

3      At any point, Mr. Guerra, Mr. Lujano, Mr. McClenehan and/or Mr. Jaramillo could have

4  come clean, and admitted their respective roles in perpetuating the fiction of an arms-length sale.

5  Mr. Goldstein could have admitted that Mr. Guerra was involved with Metricz and that he

6  treated Mr. Guerra as an agent of Metricz. Mr. Zlotoff could have admitted that his lack of

7  oversight contributed to the problem. There was little risk in any of the parties taking these

8  actions, given that the sale ultimately appeared to have been for a price that was higher than the

9  Property's actual value and the estate had apparently not yet been harmed. The OSC would

10 likely have been dissolved. Instead, Mr. Guerra, Mr. Lujano. Mr. McClenehan, Mr. Jaramillo

11 and Mr. Goldstein steadfastly refused to tell the truth and Mr. Zlotoff refused to take

12 responsibility for his failure to monitor the case. The end result was a web of incredible and

13 inconsistent tales, which wasted the trustee's and the Court's time and resources, all the while

14 exponentially increasing the cost to the estate.

15      Unfortunately for the parties, the Court did not buy their tales. And while the Court

16 recognizes that it may still not know exactly what happened and why, nine days of evidentiary

17 hearings have convinced the Court that Mr. Guerra, Mr. Lujano, Mr. Jaramillo and, most likely,

18 Mr. Goldstein acted in bad faith, lied under oath, and committed fraud on the Court. As a result,

19 sanctions are appropriate and will be levied as specifically identified below.[1] Further, the Court

20 has tentatively determined that Mr. McClenehan's company, Eagle Home Loans,[2] received an

21

22      [1]The parties are fortunate that the sanctions are not greater. As noted below, the only reason that
the Property ultimately sold for $610,000 is because there was a fight over Debtor between its two
23 ostensible shareholders, Mr. Guerra and Mr. Aguilar, and Mr. Aguilar brought a competing bidder to
the sale. Without a competing buyer, the Property would have sold for the $400,000 originally offered
24 by Metricz and the estate would have been harmed in the amount of $210,000 (i.e., the amount the
Property could have sold for minus the actual sale price), or in whatever amount the Court ultimately
25 determined was a fair price for the Property. Thus, it is by pure luck that the parties are not faced with
substantially larger sanctions.

26      [2]Mr. McClenehan testified that he is the president, CEO and 100% shareholder of Eagle Home
27 Loans, Inc. See 7/25/08 Transcript, Docket #269, at 24:18-25:1; 10/6/08 Transcript, Docket #289, at
77:3-24. Thus, for purposes of this Memorandum, the terms "Mr. McClenehan" and "Eagle Home
28 Loans" are used interchangeably.

$18,300 commission as Debtor's real estate agent, to which it was not entitled and which must be disgorged. Finally, a sanction in the form of disgorgement of the entire amount of fees that were paid to Mr. Zlotoff during the course of this case shall be levied against Mr. Zlotoff for his failure to comply with the specific terms of the Court's sale order and his failure to properly administer this case as Avon's counsel.

## I.    PROCEDURAL BACKGROUND

### A.    Events Leading to the Bankruptcy

1.    In January 2001, Luis Aguilar ("Mr. Aguilar") and his wife purchased property located at 14416 and 14429 Avon Avenue, Lathrop, California (the "Property"), with the intention of developing it into twelve townhomes. See Declaration of Mohamed Poonja in Support of Motion to Approve Compromise of Controversy, Docket #136, at ¶ 2. At some point, after determining that he needed a partner to assist him in the development project, Mr. Aguilar answered an advertisement placed in the newspaper by Mr. Guerra. Id. The advertisement represented that Mr. Guerra had experience in joint real estate development projects. Id.

2.    In early January 2002, Mr. Aguilar and Mr. Guerra entered into a Development Agreement, whereby they agreed that the Property would be transferred to, and developed by, a newly-formed entity, Avon Townhomes Venture ("Debtor" or "Avon").[3] Pursuant to the Agreement, Mr. Aguilar agreed to transfer the Property to Avon and to continue making the mortgage payments. Id. at ¶ 4.

3.    Along with the Development Agreement, Mr. Guerra and Mr. Aguilar prepared and executed Bylaws, which vested sole management control of Avon in Mr. Guerra, and subordinated Mr. Aguilar's stock to that held by Mr. Guerra. Id. Pursuant to the Bylaws, Mr. Aguilar's stock was subject to forfeiture if the mortgage payments fell more than two months behind. Id.

---

[3]Mr. Aguilar and Mr. Guerra had entered into a previous Development Agreement in November 2001. For reasons unknown, that agreement was never performed and was replaced by the January 2002 Development Agreement. See Declaration of Mohamed Poonja in Support of Motion to Approve Compromise of Controversy, Docket #136, at ¶¶ 3-4.

1    4.    Avon's Articles of Incorporation were filed with the California Secretary of State

2  on February 28, 2002.  Id.

3    5.    Mr. Aguilar transferred the Property to Avon in March 2002.  Id.

4    6.    Between March of 2002 and April of 2003, it does not appear that Mr. Guerra

5  made any progress in developing the Property.  Id. at ¶¶ 6-7.

6    7.    On April 2, 2003, Avon borrowed $120,000 from Fernando Jimenez ("Mr.

7  Jimenez"), in part, to pay the balance due to the City of Lathrop for fees necessary to obtain

8  sewer hookup rights for the development of the Property (the "Jimenez Loan").[4]  Id. at ¶¶ 7- 8.

9  Subsequently, the fees were paid and the City of Lathrop granted Avon sewer hookup rights for

10  12 units on the Property (the "Sewer Hookups").  Id. at ¶ 8.

11    8.    In July of 2004, Mr. Aguilar, apparently unhappy with Mr. Guerra's lack of

12  progress in developing the Property, purported to terminate the Development Agreement.  Id. at

13  ¶ 9.  Thereafter, Mr. Aguilar instructed the two tenants of the Property to begin paying rents

14  directly to him, and not to Avon.  Id.

15    9.    After learning of Mr. Aguilar's demand that the tenants pay rent directly to him,

16  Mr. Guerra purportedly "terminated" Mr. Aguilar's shareholder interest in Avon.  Id.

17    10.    The Jimenez Loan matured in April 2004, but was not paid.  Id. at ¶ 11.

18  Thereafter, Mr. Jimenez recorded a Notice of Default.  Id.

19    11.    In August 2004, Mr. Aguilar borrowed $16,000 from his parents and paid the

20  funds to Mr. Jimenez, which caused Mr. Jimenez to rescind the Notice of Default.  Id.  Several

21  months later, however, Mr. Jimenez recorded a new Notice of Default and scheduled a Trustee's

22  Sale of the Property for May 27, 2005.  Id.  Mr. Aguilar borrowed an additional $134,000 from

23  his parents and used the funds to pay Mr. Jimenez in full on May 26, 2005 (i.e., the day before

24  the Trustee Sale).  Id.

25  / / / /

26

27    [4]The Jimenez Loan was secured by the Property.  See generally Declaration of Mohamed Poonja
    in Support of Motion to Approve Compromise of Controversy, Docket #136, at ¶11.

28

**B.   The Bankruptcy Filing**

1.      On May 26, 2005, Mr. Guerra filed for chapter 11 bankruptcy protection on behalf of Avon.[5]  See Voluntary Petition, Docket #1, at p. 2.  The petition was filed *in pro per*. Id.

2.      The Statement of Financial Affairs indicated that Avon's principals and sole shareholders were Mr. Guerra and Mr. Aguilar.[6]  See SOFA #21, Docket #24, at p. 9.  The bankruptcy petition was signed by Mr. Guerra as Avon's President.  See Voluntary Petition, Docket #1, at. p. 2.  Mr. Guerra also acted as Avon's Responsible Individual.  See Order Granting Application to Designate Responsible Individual Joe Guerra, Docket #16.

3.      As of the bankruptcy filing, the only asset owned by Avon was the Property.  See Amended Schedule A, Docket # 24, at p. 2.

4.      On or about July 13, 2005, Mr. Zlotoff substituted in as Avon's counsel.  See Notice Regarding Appearance of Attorney for Debtor, Docket #12.

**C.   The Motion to Sell Property**

1.      On November 10, 2005, Avon filed a Motion seeking authority to sell the Property to an entity known as Metricz, a California corporation, for the purchase price of $400,000 (the "Sale Motion").  See First Amended Motion to Sell Free and Clear, Docket #32.

2.      The Sale Motion represented that "Avon has negotiated a sale of the [Property] to a corporation, Metricz, *unrelated to Avon or to either of its equity owners.*"  Id. at 3:5-8 (emphasis added).

/ / / /

----

[5]The only creditors listed by Mr. Guerra were Mr. Jimenez and The Foreclosure Company, Inc. See List of Creditors, Docket #1, at p. 7.  Thus, it appears that Mr. Guerra was not aware that Mr. Aguilar had paid Mr. Jimenez in full, and Mr. Guerra filed the bankruptcy in an attempt to halt the foreclosure sale, which he believed was set for the next day.  This was likely the result of the fact that Mr. Guerra and Mr. Aguilar appear to have had a falling out and stopped communicating after Mr. Guerra "terminated" Mr. Aguilar's interest in Avon.  See Declaration of Mohamed Poonja in Support of Motion to Approve Compromise of Controversy, Docket #136, at ¶ 9.

[6]Despite this, Mr. Aguilar claims that he was not consulted, nor was he involved in the decision to file bankruptcy.  See generally Transcript of 12/7/05 Sale Hearing, Docket #191, at 22:6-26:22.

3.    The Sale Motion was supported by a declaration from Mr. Guerra, which stated, in pertinent part, "The [P]roperty was listed for sale by a broker who very quickly obtained a buyer based upon his personal contacts. *Neither I nor Luis Aguilar, nor the [D]ebtor, have any relationship or connection with the proposed buyer*." See Declaration of Joe Guerra in Support of Motion to Sell Free and Clear, Docket #30, at 2:16-19 (emphasis added).

4.    On November 23, 2005, Mr. Aguilar filed an Objection to the Sale Motion. The basis for the Objection was that Mr. Aguilar had found a buyer, Tom Sayles ("Mr. Sayles"), who was willing to purchase the Property for $550,000. See Objection to Debtor's Motion to Sell Free and Clear, Docket #35.

5.    A hearing on the Sale Motion and the competing bids was held on December 7, 2005 (the "Sale Hearing"). See Transcript of 12/7/05 Sale Hearing, Docket #191. Mr. Guerra and Mr. Zlotoff appeared on behalf of Avon. Mr. Jaramillo appeared on behalf of Metricz, as its President. Mr. Sayles and his attorney, Jung Park, appeared on behalf of Mr. Sayles. Ms. Dumas appeared on behalf of the United States Trustee. Other appearances were noted in the record.

6.    At the Sale Hearing, there was substantial discussion between the parties and the Court regarding the disinterestedness of Metricz and Mr. Sayles, and regarding the ownership dispute between Mr. Guerra and Mr. Aguilar. In response, the Court expressed its inclination to continue the Sale Hearing, stating,

> [W]e have a [Debtor] with some governance issues. . . . [W]e have some questions about who the buyers are. Exactly who the buyers are and are they truly disinterested third parties? . . .
>     [I]f there are any connections between anybody, then that becomes a concern. . . . .
>     I was sitting here thinking about what I want to do about this. And one of the things that's running through my mind is to continue this. . . .
>     [F]rom my perspective the absolutely [sic] most important thing is that a sale is done fairly; it's legitimate; everybody has a fair shot at buying; that there's no shenanigans; there's no inside deals; there's no undisclosed relationships; there's none of this stuff. . . . .
> [T]here's an integrity of the process that to me is the most important. And I'd rather lose a sale than have one – one tainted by some wrongdoings.

See Transcript of 12/7/05 Sale Hearing, Docket #191, at 27:20-28:17.

7.     Following a lengthy recess, the parties decided to go forward with the auction and sale and Avon chose the Metricz offer over the Sayles offer. Regarding the disinterestedness of the parties, Ms. Dumas stated for the record,

> Your Honor, I spoke to Mr. Guerra, who is the responsible individual of the [D]ebtor. And I questioned him again about any connections that he might have with this buyer. He said he has no connections with Mr. Jaramillo, the president of Metricz Corporation.
> Mr. Jaramillo similarly says he has no prior connections with Mr. Guerra. Mr. Guerra told me he has no connections with Carlos Hernandez, who is. . . one of the shareholders of Metricz[.]
> And Mr. Guerra told me he has no connections [sic] Raymundo Lujano, who is the individual who will be . . . the guarantor. . . .
> In any event, Mr. Guerra says . . . he doesn't know any of these people, he's never met them, he's never seen them. He has no prior connection.
> I said, "So how did you and this group of parties come together then?" He said that he deals with Eagle Loan, which is a local loan broker. He's had frequent dealings with that company. He told people at the company that he had a piece of property that he needed to sell and that if they knew anybody interested in buying, to let him know.
> They did that, and that's how he and . . . Metricz . . . came to be involved in this proceeding. This is what he told me. I have no evidence to the contrary.
> Similarly, I've no evidence to believe that there is any prior connection between Mr. Sayles and Mr. Aguilar. . . .

See Transcript of 12/7/05 Sale Hearing, Docket #191, at 43:19-44:24. Neither Mr. Guerra nor Mr. Jaramillo corrected or disputed Ms. Dumas's recitation of the conversations, and neither party responded when Judge Grube asked if anyone had any comments. Id. at 45:10-22.

8.     Subsequently, the Court approved the sale to Metricz for the sum of $610,000, subject to specific conditions set forth on the record.

9.     Among the conditions articulated by the Court was the requirement that Metricz tender two non-refundable deposits. The first non-refundable deposit of $25,000 was ordered to be paid in certified funds on December 8, 2005, one day after the auction and Sale Hearing. See Transcript of 12/7/05 Sale Hearing, Docket #191, at 49:14-19. The second non-refundable deposit of $100,000 was to be paid in certified funds on January 9, 2006. Id. at 49:20-50:7. The certified funds for these deposits were to be held by Mr. Zlotoff in his trust account, pending further order of the Court authorizing transfer of the funds to the title company to close escrow. Id. at 48:24-50:9. If either deposit was not made timely, Mr. Zlotoff was **required** to declare a default and notify opposing counsel and Ms. Dumas. Id. at 56:12-14 (emphasis added). If a

1   default were declared, the Court gave Debtor the option of proceeding with Mr. Sayles'

2   $550,000 back-up offer, or returning to the Court for further proceedings. Id. at 56:15-23.

3       10.     Mr. Zlotoff drafted an order memorializing the terms of the sale and the order was

4   entered on December 30, 2005 (the "Sale Order").  See Order Authorizing Sale Free and Clear of

5   Interests, Docket #41.[7]

6       11.     The sale of the Property closed on February 3, 2006.  See Declaration of

7   Mohamed Poonja in Support of Motion to Approve Compromise of Controversy, Docket #136,

8   at 7:7.

9       **D.    Metricz Litigation**

10      1.      On June 7, 2006, Metricz filed an adversary proceeding against Avon, Mr.

11  Aguilar, the City of Lathrop and Fernando Jimenez (Adversary Proceeding No. 06-5127) (the

12  "Adversary Proceeding").   The crux of Metricz's claim was that it was induced to purchase the

13  Property at the Sale Hearing by Avon's alleged representation that the Property had been granted

14  the Sewer Hookups, when, in fact, those Sewer Hookups had been terminated by one or all of the

15  Defendants prior to the sale.  Metricz alleged that it was damaged in the amount of $865,000,

16  when it could not resell the Property at a significant profit due to the loss of the Sewer Hookups.[8]

17  See Complaint in Case No. 06-5127, Docket #1.

18  / / / /

---

20      [7]The terms of the Sale Order differed slightly from the conditions articulated by the Court on the
    record.  First, unlike the conditions stated on the record at the hearing, the Sale Order did not require
21  Mr. Zlotoff to hold the certified funds in his trust account pending further order of the Court authorizing
    transfer of the funds to the title company to close escrow.  See Order Authorizing Sale Free and Clear
22  of Interests, Docket #41, at 2:9-3:7.  Second, contrary to the conditions articulated at the Sale Hearing
    that required Mr. Zlotoff to declare a default if the deposits were not made timely, the Sale Order
23  provided only that Avon **may** declare a default if the deposits were not made as specified.  Id. at 2:19-
    23.  Given that the Sale Order did not accurately reflect the Court's rulings, the Court erred in entering
24  the Sale Order in its final form.

25      [8]The $865,000 in damages sought reflected the difference between the $610,000 purchase price
    that Metricz paid for the Property, and the $1.475 million purchase offer that Metricz allegedly obtained,
26  but that fell through when the "proposed buyer" found out that the Sewer Hookups had been terminated.
    See Metricz's Case Management Conference Statement in Case No. 06-5127, Docket # 58, at 3:1-3.
27  The "proposed buyer" was none other than Mr. McClenehan.  See Metricz's Mediation Statement,
    attached as Exhibit Q to the Chapter 11 Trustee's Report of Investigation in Case No. 05-53243, Docket
28  # 184.

2.      In return, Avon filed a counterclaim against Mr. Jimenez, Mr. Aguilar and the City of Lathrop, seeking indemnity, a finding of a willful violation of the automatic stay, declaratory relief and turnover of proceeds paid by the City of Lathrop to Mr. Jimenez.  See Answer and Cross Claim in Case No. 06-5127, Docket #8.

3.      The City of Lathrop also filed a Cross-Claim against Debtor, Mr. Jimenez and Mr. Aguilar, seeking indemnity and declaratory relief.  See Answer to Cross Claim and Cross Claim in Case No. 06-5127, Docket #16.

**E.      Trustee Appointment**

1.      Following commencement of the Adversary Proceeding, the UST and the chapter 7 trustee in Mr. Aguilar's bankruptcy proceeding (the "Aguilar Trustee")[9] raised questions regarding potential connections between Metricz and Mr. Guerra.  In response, both the UST and the Aguilar Trustee filed motions to convert Avon's bankruptcy case to chapter 7.  See Motion by United States Trustee to Convert Chapter 11 Case to Chapter 7, Docket # 39 and Motion to Convert Case From Chapter 11 to Chapter 7; Alternative Motion for Authority to Prosecute Causes of Action, Docket #94.  After a joint hearing on the motions, in lieu of conversion, the Court ordered the appointment of a chapter 11 trustee so that an independent third party could investigate, among other things, whether there had been an undisclosed relationship between Mr. Guerra and Metricz.  See Transcript of Chapter [7] Trustee's Motion to Convert and U.S. Trustee's Motion to Convert, Docket #127, at 27:20 - 33:5.

2.      On May 11, 2007, Mohamed Poonja  was appointed chapter 11 trustee (the "Trustee").  See Order Granting Motion to Appoint Trustee, Docket # 114.

**F.      Settlement of the Adversary Proceeding and Other Pending Disputes**

1.      After the Trustee's appointment, the Trustee, Metricz, Mr. Guerra, the Aguilar Trustee, and various other parties participated in a mediation conducted by the Honorable Thomas E. Carlson (the "Mediation").  See generally Motion to Approve Compromise of

---

[9]Mr. Aguilar and his wife filed a chapter 13 bankruptcy case on October 2, 2005.  The case was subsequently converted to chapter 7 on January 24, 2007.  See In re Luis and Elizabeth Aguilar, Case No. 05-56609-ASW.

Controversy, Docket #135. As a result of the Mediation, the parties entered into a global settlement (the "Settlement"), wherein, among other things, the parties granted general releases of all claims, except that the Trustee's releases did not apply to any claims of fraud, collusion or other misconduct related to the sale of the Property. Id. at 9:13-10:22. In addition, the Trustee agreed to assign any and all rights of action it held against Mr. Jimenez, to Metricz.[10] Id. at 9:20-21.

    2.       An Order Approving the Settlement was entered on September 13, 2009. See Order Granting Application to Compromise Controversy, Docket # 148.

    **G.**      **Trustee's Report of Investigation**

    1.       Following his appointment, the Trustee conducted an extensive investigation, including taking the Rule 2004 examinations of Mr. Guerra, Mr. Jaramillo, Mr. Lujano and Mr. McClenehan.

    2.       On January 24, 2008, the Trustee filed his Chapter 11 Trustee's Report of Investigation (the "Report"). See Chapter 11 Trustee's Report of Investigation, Docket #184. In the Report, the Trustee concluded that: (1) Mr. Guerra had a relationship with Metricz that preceded the Sale of the Property; (2) Mr. Guerra and Mr. Jaramillo had a material relationship; (3) Metricz may have been concealing who directed the Sale; (4) Mr. Guerra likely played a role in the formation of Metricz; (5) Mr. Guerra attempted to "steer" the Property to Metricz; (6) it is likely that Metricz fabricated allegations and documents to support its claims in the Adversary Proceeding; (7) Mr. Guerra committed perjury at his 2004 examination; (8) Mr. McClenehan's commission was paid without adequate disclosure; (9) Mr. Zlotoff failed to discharge his obligations as counsel to Avon; and (10) Mr. Guerra failed to claim income earned from Avon on his federal tax returns. Id.

    3.       Subsequently, the Trustee filed a Motion requesting that the Court issue an Order to Show Cause to various parties to address the allegations made by the Trustee in the Report.

---

[10]Thereafter, in part as a result of the Settlement and in part as a result of other events, the only parties remaining in the Adversary Proceeding were Metricz and Mr. Jimenez.

<u>See</u> Motion for Order to Show Cause, Docket # 201.

    4.    At the hearing on the Trustee's Motion, the Court determined that the Trustee had raised issues of sufficient concern to justify the issuance of an Order to Show Cause.

**H.    The Order to Show Cause**

    1.    On May 15, 2008, the Court issued the current OSC.  <u>See</u> Order to Appear and Show Cause, Docket #222.  The OSC specifically stated that the Court was considering whether Mr. Guerra, Metricz, Mr. Jaramillo, Mr. McClenehan and/or Mr. Lujano should be sanctioned pursuant to 11 U.S.C. § 105 in light of the allegations that they committed fraud upon the Court by actively concealing and misrepresenting an insider connection between Metricz and Avon. <u>Id.</u> [11]

    2.    On October 7, 2008, after hearing the testimony of various parties, the Court amended the OSC to include Mr. Zlotoff as counsel for Debtor, and Mr. Guerra as Avon's President and Responsible Individual.  <u>See</u> Amended Order to Appear and Show Cause, Docket #281.  The Amended OSC specifically stated that the Court was considering whether Mr. Zlotoff and/or Mr. Guerra should be sanctioned pursuant to 11 U.S.C. § 105 for their failure to properly discharge their duties as fiduciaries to the Avon bankruptcy estate (the "Bankruptcy Estate") and its creditors.  <u>Id.</u>

/ / / /

/ / / /

/ / / /

/ / / /

---

[11]Contemporaneous with the issuance of the OSC, the Court also issued an Order to Show Cause in the Adversary Proceeding (the "APOSC").  <u>See</u> Order to Appear and Show Cause in Case No. 06-5127, Docket # 67.  The APOSC specifically stated that the Court was considering whether Metricz, Mr. Jaramillo, Mr. McClenehan and/or Mr. Lujano should be sanctioned in light of the allegations that they committed fraud upon the Court by manufacturing claims and documentation to support the damages sought in the Adversary Proceeding, and whether Mr. Goldstein should be sanctioned for failing to appropriately discharge his duties as an officer of the Court and as counsel for Metricz by filing and continuing to prosecute the damages cause of action after its legitimacy was called into doubt.  <u>Id.</u> The APOSC is separate and distinct from the proceedings on the OSC.  As a result, this Memorandum Decision does not deal with the Adversary Proceeding or any of the allegations in the APOSC.  The APOSC is still pending as of the date of this Memorandum.

## II.     FACTUAL BACKGROUND

The following factual background was distilled from the testimony of the various parties at the OSC.[12]

### A.     Steps Taken by Mr. Guerra as Avon's Responsible Individual to Market and Sell the Property

When Avon decided to sell the Property, Mr. Guerra contacted Mr. McClenehan at Eagle Home Loans.[13] See Deposition of Joe Guerra, dated July 19, 2007, at 81:16-17. Mr. Guerra testified that he had previously done business with Mr. McClenehan and decided to hire him to act as Avon's broker because Mr. McClenehan "shared with [Mr. Guerra] that he runs ads in the paper from time to time." Id. at 81:13-17; 89:12-19. Mr. Guerra claimed that he and Eagle Home Loans never filled out a listing agreement employing Mr. McClenehan as Avon's broker because Mr. McClenehan immediately offered that he had a buyer.[14] Id. at 81:13-17; 84:8-21 .

Mr. Guerra also testified that while he wanted top value for the Property, he did not get the Property ready for sale and did not personally take any steps to ensure that the Property was marketed or shown. Id. at 85:6-86:2; 88:4-89:8. Mr. Guerra explained that he believed that the marketing of the Property was Mr. McClenehan's responsibility because Mr. McClenehan was Avon's broker and would be receiving a commission from any sale. Id. Mr. Guerra testified that

---

[12]The Court recognizes that the testimony of the witnesses is inconsistent and that the various stories, at best, do not hold together well and, at worst, are patently ridiculous. This is the result of the failure of various key players to testify truthfully, or their refusal to testify at all. Despite these limitations, the Court has attempted to cobble together a coherent story from all of the divergent tales, while identifying where those tales diverge.

[13]Mr. Guerra invoked the Fifth Amendment in response to many of the questions he was asked at the OSC hearings. In response, the Trustee's counsel, Mr. Tate, read portions of Mr. Guerra's 2004 Examination testimony into the record. Mr. McClenehan's counsel, Mr. Roberts, objected on hearsay grounds. The Court finds that by invoking the Fifth Amendment and refusing to answer questions, Mr. Guerra made himself unavailable as a witness. See Federal Rule of Evidence 804(a)(1) and (2). As a result, Mr. Guerra's Rule 2004 Examination testimony constitutes an exception to the hearsay rule and is admissible. See Federal Rule of Evidence 804(b). Thus, Mr. Roberts' objection is overruled.

[14]Mr. Guerra originally claimed that it was during their first conversation regarding the Property that Mr. McClenehan offered that he had a buyer. See Deposition of Joe Guerra, dated July 19, 2007, at 84:10-21. Later, he backtracked and said that Mr. McClenehan found a buyer "relatively quick [sic]." Id. at 90:7-91:7. Mr. Guerra's testimony on this point appears to be a complete fabrication in an attempt to conceal the fact that before contacting Mr. McClenehan, Mr. Guerra already knew that Metricz would be the buyer.

while he "understood" that Mr. McClenehan would market and show the Property to potential purchasers, Mr. Guerra did not have any actual knowledge of any marketing efforts because he never asked or followed up with Mr. McClenehan. Id. at 87:3-88:25.

Mr. Guerra further testified that he only had a few conversations with Mr. McClenehan regarding the Property, and that the only conversation he had with Mr. McClenehan after authorizing Mr. McClenehan to sell property was to ask if escrow had closed.[15] Id. at 82:8-11; 96:2-12. Mr. Guerra testified that he had not heard of Metricz before the Sale Hearing and did not learn that Metricz was the proposed buyer until the Sale Hearing.[16] Id. at 91:18-93:24.

## B. The Sale

Mr. McClenehan testified that Mr. Guerra approached him to see if he could find somebody interested in buying the Property. Mr. Guerra allegedly provided only a rough idea of the details of the Property and allegedly did not provide a price range for the sale. See 7/25/08 Transcript, Docket #269, at 26:15-25; 27:1-11; 34:1-17. Mr. McClenehan testified that he did not list the property for sale, but simply mentioned the Property to people he came across in his daily activities, including Mr. Hernandez, who allegedly referred Mr. Lujano to Mr. McClenehan.[17] See 7/25/08 Transcript, Docket #269, at 27:17-28:7; 9/24/08 Transcript, Docket

---

[15]Mr. Guerra justified this lack of contact with Mr. McClenehan by explaining, "[W]hen I . . . hire subcontractors, I hire competent people. So why would I involve myself - - that would be an insult." See Deposition of Joe Guerra, dated July 19, 2007, at 98:2-8. This testimony is completely unbelievable. If Mr. Guerra was not talking with Mr. McClenehan, then who was negotiating the sale on behalf of Avon? Mr. Zlotoff testified that it was Mr. Guerra who brought the completed contract to Mr. Zlotoff. See 10/27/08 Transcript, Docket #292, at 8:9-21. Mr. Zlotoff also testified that he never spoke to Mr. McClenehan prior to, or during the sale transaction. Id. The only possible scenarios are that Mr. Guerra was lying about his role in procuring the sale to Metricz or that Mr. Guerra completely abdicated his fiduciary duties to Avon as its responsible individual in failing to monitor professionals acting on Avon's behalf. Neither scenario is favorable to Mr. Guerra.

[16]This testimony also appears to be a lie. Mr. Guerra signed a declaration in support of the Sale Motion which stated that he had no connection with Metricz. Thus, as of the date of the Sale Motion in 2005, he had to have known of Metricz. If he did not know, it proves only that he lied in his declaration in support of the Sale Motion.

[17]Mr. Lujano testified that it was actually a "Mr. de la Torre" who introduced him to Mr. McClenehan. See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 45:13-15. The Court does not believe that Mr. de la Torre exists and therefore, doubts Mr. Lujano's recollection regarding how he met Mr. McClenehan. See infra section 2C ("The Formation of Metricz and the Elusive Mr. de la Torre").

#287, at 43:10-44:7. Mr. McClenehan did not provide Mr. Hernandez or Mr. Lujano with any details regarding the Property. Instead, he provided both of them with the address and simply told them to go see the Property for themselves.[18] See 7/25/08 Transcript, Docket #269, at 28:10-23; 9/24/08 Transcript, Docket #287, at 44:1-10. A couple of weeks later, Mr. Lujano spoke with Mr. McClenehan again and expressed his interest in purchasing the Property. See 7/25/08 Transcript, Docket #269, at 29:1-4. Mr. McClenehan believes he drew up the initial purchase offer for Mr. Lujano, but Mr. McClenehan did not recall what the price was, or to whom it was presented. Id. at 35:1-23.

Mr. Zlotoff testified that Mr. Guerra came to him with a contract of sale that indicated that Metricz was the buyer. Mr. Zlotoff did not recall having a conversation with Mr. Guerra regarding how Metricz found out about the Property or became interested in purchasing the Property. See 10/27/08 Transcript, Docket #292, at 8:9-21. Mr. Zlotoff did not talk to Mr. McClenehan prior to filing the Motion to Approve the Sale and he did not recall speaking with Mr. McClenehan during the transaction. Id. at 9:6-8; 10:8-9.

## C. The Formation of Metricz and the Elusive Mr. de la Torre

Mr. Lujano testified that he assists people with drug and alcohol problems, explaining, "I rescue the people, I rehabilitate them, I get them into a program, and they work, and . . . then I let them out into the community to redo their lives." See 8/22/08 Transcript, Docket #270, at 90:25-91:6; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 30:2-15. He claimed that these people originally lived with him at his home in San Jose, but that his house got too small. See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 29:21-30:7. Thereafter, he decided that he wanted to purchase a property outside of San Jose to create an alcohol and drug rehabilitation facility to house these individuals. See 8/22/08 Transcript, Docket #270, at 79:23-25; 9/10/08

---

[18]Mr. McClenehan testified that he had a five minute telephone conversation with Mr. Lujano regarding the Property. See 7/25/08 Transcript, Docket #269, at 28:10-29:4. The Court does not find this testimony to be credible. Mr. McClenehan doesn't speak Spanish. See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 10:2-3. Mr. Lujano testified that he doesn't speak English well, has only a sixth grade education and required a translator for the OSC hearings. See 8/22/08 Transcript, Docket #270, at 17:7-21. Assuming Mr. Lujano's English is as limited as he portrayed it, there is no indication that Mr. McClenehan would have been able to communicate effectively with Mr. Lujano.

Transcript in Case No. 06-5127, Docket #145, at 29:19-30:7. A Mr. Carlos de la Torre[19] ("Mr. de la Torre") informed Mr. Lujano that a corporation was the best way to purchase property.[20] See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 35:20-36:2; 45:7-9.

Mr. Lujano testified that it was Mr. de la Torre that helped him purchase Metricz.[21] See 8/22/08 Transcript, Docket #270, at 66:14-16. He also testified that he believed that he had paid Mr. de la Torre approximately $1,500 for the purchase.[22] Id. at 66:19-67:5; 10/15/08 Transcript, Docket #291, at 30:23-31:12. In return, Mr. Lujano claims he was given "a paper that indicated that [he] was the new owner."[23] See 10/15/08 Transcript, Docket #291, at 31:17-18. Mr. Lujano could not remember if he purchased Metricz before of after he applied for loans to

---

[19]It is unclear how or when Mr. Lujano allegedly met Mr. de la Torre. What is clear is that other than Mr. Lujano, no other party to the proceeding knew, or had ever seen Mr. de la Torre. See 10/6/08 Transcript, Docket #289, at 99:6-7 (Mr. Jaramillo does not know Mr. de la Torre); 10/6/08 Transcript, Docket #289, at 74:2-13 (Mr. Goldstein does not know Mr. de la Torre); 10/15/08 Transcript, Docket #291, at 104:11-23 (Mr. Guerra does not admit to knowing Mr. de la Torre, the Trustee was not able to find Mr. de la Torre, and Mr. McClenehan has not seen Mr. de la Torre); 10/27/08 Transcript, Docket #292, at 26:3-7 (Mr. Zlotoff does not know Mr. de la Torre). Mr. Lujano never provided any evidence or credible testimony to convince the Court of Mr. de la Torre's existence. The Court presumes that if Mr. de la Torre had participated in the purchase of the Property as extensively as Mr. Lujano claims he did, some other party to the sale would have seen, spoken to, or interacted with him. No one did. Thus, the Court has concluded that Mr. Lujano made Mr. de la Torre up and no such person exists. The Court has also concluded that the only reason for making up Mr. de la Torre, was so that Mr. Lujano could have an excuse for not knowing anything about his purchase of Metricz, his purchase of the Property, and all of the events surrounding the two.

[20]Mr. Lujano testified that he did not know how a corporation works, and that he only purchased Metricz because of Mr. de la Torre's representations. See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 35:20-36:2.

[21]It is unclear who owned Metricz prior to Mr. Lujano's purchase of the corporation. At one point, Mr. Lujano testified that Mr. de la Torre was the individual that created Metricz. See 8/22/08 Transcript, Docket #270, at 66:14-24. Mr. Lujano later testified that he did not know who had formed Metricz, but that he had purchased it from Mr. de la Torre. See 10/15/08 Transcript, Docket #291, at 30:22-24. It is also unclear what Mr. Lujano thought he was buying when he "purchased" Metricz.

[22]Mr. Lujano claims that he never obtained a receipt for the payment because he "trusted" Mr. de la Torre. See 8/22/08 Transcript, Docket #270, at 67:6-7; 10/15/08 Transcript, Docket #291, at 31:13-18.

[23]Mr. Lujano described the paper as a single page. He could not remember what it said or what he did with it, but claimed it was a guaranty that he was the new owner. See 10/15/08 Transcript, Docket #291, at 31:17-32:18. Mr. Lujano also could not remember if he ever received any other paperwork from Mr. de la Torre relating to Metricz. Id. at 32:6-9.

purchase the Property.[24]  See 9/24/08 Transcript, Docket #287, at 11:2-11.

Mr. Lujano claimed that he raised approximately $150,000 through cash donations collected at Christ the King Church on Monterey Road in San Jose, for the purpose of purchasing Metricz and making the down payments on a property.  See 8/22/08 Transcript, Docket #270, at 64:20-25; 67:17-68:3; 93:18-94:2; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 25:4-10.  Mr. Lujano alleges that the funds were "gifts" and, despite having a bank account, the cash was kept at his house because "it was not [his] money."[25]  See 8/22/08 Transcript, Docket #270, at 64:16-19; 65:9-17; 100:15-25; 112:1-13.

Mr. Lujano knew little to nothing about the purchase of the Property and claimed that was the case because Mr. de la Torre assisted him and did everything that needed to be done. Mr. Lujano claimed that he simply asked Mr. de la Torre to "buy something outside of San Jose[.]"[26]  Id. at 70:1-3.

Mr. Lujano testified that he never visited the Property prior to the Sale Hearing, nothing about the Property had been described to him before the Sale Hearing, and he did not learn what property had been purchased until after the Sale Hearing.  See 8/22/08 Transcript, Docket #270, at 70:24-71:4; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 36:10-19; 10/15/08 Transcript, Docket #291, at 20:21-22; 21:21-25; 42:12-16.  He further testified that even at the time he made the initial $25,000 deposit to buy the Property, he did not know what was being

---

[24]He later changed his testimony and stated that he had purchased Metricz before he purchased the Property.  See 10/15/08 Transcript, Docket #291, at 32:3-5.

[25]The Court notes that no receipts or proof of the cash were ever provided and no one, other than Mr. Lujano, claims to have seen or utilized cash for any part of the purchase of the Property.

[26]Subsequently, Mr. Lujano testified that it was Mr. Jaramillo who informed Mr. Lujano about potentially purchasing the Property.  See 8/22/08 Transcript, Docket #270, at 71:20-72:2. Mr. McClenehan testified that neither Mr. Jaramillo nor Mr. de la Torre were ever involved in the process. See 9/24/08 Transcript, Docket #287, at 32:3-20.  Mr. Jaramillo denies that he was involved in the sale of the Property prior to making the bid at the Sale Hearing on December 7, 2005.  See 10/6/08 Transcript, Docket #289, at 83:14-84:16; 89:15-90:20.

purchased.  See 8/22/08 Transcript, Docket #270, at 68:10-13.[27]

At the time that Mr. Lujano purchased Metricz, Mr. Hernandez was on the Board of Directors.[28]  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 33:25-34:3.  Later, Mr. Lujano, Mr. Jaramillo, and possibly Mr. de la Torre were added.[29]  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 34:18-35:3.

### D.    Mr. Jaramillo as President of Metricz

Mr. Jaramillo testified that Mr. Lujano contacted him by phone and asked Mr. Jaramillo to become Metricz's interim president so that Mr. Jaramillo could go to court to bid on the Property.  See 10/6/08 Transcript, Docket #289, at 83:19-84:19.  Mr. Jaramillo claimed that Mr. Lujano contacted him because Mr. Lujano was not comfortable speaking English and he needed someone to go to court to bid on the Property on Metricz's behalf.[30]  Id.  Mr. Jaramillo testified

---

[27]Mr. Lujano's testimony on this point completely contradicts Mr. McClenehan's testimony. Mr. McClenehan testified that he spoke with Mr. Lujano and told Mr. Lujano to go look at the Property prior to making an offer.  See 7/25/08 Transcript, Docket #269, at 28:10-23.  Mr. McClenehan also claims that Mr. Lujano did look at the Property and then contacted Mr. McClenehan to indicate his interest in purchasing it.  Id. at 29:1-4.  Given Mr. Lujano's lack of knowledge regarding any of the events that occurred in this case, his testimony that he did not know what property was being purchased and never saw it prior to the sale may be the only true testimony that he proffered in his entire time on the stand. Unfortunately for him, however, it does not help his cause or his credibility.

[28]Mr. Lujano claims that he has "seen" Mr. Hernandez once or twice, but Mr. Lujano did not discuss Metricz business with Mr. Hernandez because Mr. Hernandez was "not very active."  See 8/22/08 Transcript, Docket #270, at 84:10-85:18; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 33:17-24.  Mr. Lujano also alleges that Mr. Hernandez either resigned or quit shortly after Mr. Lujano purchased Metricz.  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 34:4-17.  Mr. Lujano testified that Mr. Hernandez and Mr. de la Torre are two different people.  See 8/22/08 Transcript, Docket #270, at 85:5-7; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 33:13-16.

[29]Mr. Lujano believed that Mr. de la Torre had also been added to the board of directors at some point "because [Mr. de la Torre] got [the corporation] for [Mr. Lujano]."  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 34:22-25.  Currently, Mr. Lujano believes he is the only board member. He claims there have been no formal resignations, but that the other board members stopped being in touch with him. Id. at 35:1-8.  The Court notes that no corporate formalities were ever followed, thus there does not appear to be any record of the board composition at any time after Mr. Lujano's purchase. Id. at 35:9-20.

[30]Mr. Lujano claimed it was either Mr. McClenehan or Mr. de la Torre who introduced him to Mr. Jaramillo and suggested that Mr. Lujano hire Mr. Jaramillo for the auction.  See 8/22/08 Transcript, Docket #270, at 72:7-8; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 33:9-12; 45:10-12; 55:17-25.  Mr. Jaramillo and Mr. McClenehan both testified, however, that they did not meet until the first day of the Order to Show Cause hearings, thus Mr. McClenehan could not have introduced Mr. Lujano to Mr. Jaramillo.  See 9/24/08 Transcript, Docket #287, at 116:15-117:1; 10/6/08 Transcript,

that he was paid one thousand dollars in cash for his services.[31]  Id. at 85:23-24; 86:2-3.  Mr. Jaramillo did not have anything in writing specifying his responsibilities and he did not sign any papers putting him in place as the interim president of Metricz.  Id. at 85:12-17.  Mr. Jaramillo claims that he told Mr. Lujano that he was too busy to do anything for Metricz other than make the bid.  Id. at 85:20-86:1; 10/30/08 Transcript, Docket #293, at 57:21-58:5.  Mr Jaramillo further claims that nothing was ever said about his tenure lasting past the December 7, 2005 hearing.  See 10/30/08 Transcript, Docket #293, at 58:6-59:9.

Prior to making the bid, Mr. Jaramillo claimed that he reviewed Metricz's Articles of Incorporation[32] and the California Secretary of State website because he didn't want to go into court and represent that he was the president of a non-viable corporation.[33]  See 10/6/08 Transcript, Docket #289, at 100:3-11.  He claimed that he was told that Mr. Lujano was the sole shareholder.  Id. at 99:12-20.  He also claimed that he did not know who the officers or directors were.  Id.  Mr. Jaramillo testified that he only dealt with Mr. Lujano and did not meet him in person until after the sale, when Mr. Lujano came into Mr. Salciccia's office, seeking legal counsel.[34]  Id. at 100:20-22; 101:3-14.

---

Docket #289, at 94:4-13.  Further, Mr. Jaramillo testified that he does not know Mr. de la Torre.  See 10/6/08 Transcript, Docket #289, at 99:6-7.  As a result, Mr. Lujano's testimony appears to be false on this point.

[31]Mr. Jaramillo testified that the money arrived at his restaurant by courier, in an envelope, full of cash, with Mr. Lujano's name and a phone number on the envelope.  See 10/6/08 Transcript, Docket #289, at 86:16-87:22.  Mr. Lujano, however, testified that he did not know how Mr. Jaramillo was paid (i.e., cash or check), how much he was paid, by whom, or how the funds were delivered.  See 10/15/08 Transcript, Docket #291, at 22:21-24:7.

[32]It is unclear how Mr. Jaramillo reviewed the Articles of Incorporation or where he got them from, as Mr. Lujano testified that he did not know what they were and did not remember if he had ever seen them.  See 10/15/08 Transcript, Docket #291, at 35:2-10.

[33]Mr. Jaramillo testified that despite the fact that he reviewed the Secretary of State website to ensure that Metricz was a valid California corporation, he did not see that his employer, Mr. Salciccia, was listed as Metricz's agent for service of process.  See 10/6/08 Transcript, Docket #289, at 101:18-102:17; 175:16-178:5.  Notably, Mr. Salciccia was also Avon's agent for service of process.  Id. at 102:8-17.

[34]Mr. Lujano confirmed that he had previously hired Salciccia on an unrelated matter, but testified that he only had one in-person meeting with Mr. Jaramillo, which occurred not at Mr. Salciccia's office, but at Mr. Jaramillo's restaurant.  See 10/15/08 Transcript, Docket #291, at 22:1-20;

Mr. Jaramillo claimed that he hadn't spoken to Mr. Lujano since the sale and that he did not do any further work for Metricz after the sale.  <u>See</u> 10/6/08 Transcript, Docket #289, at 93:20-94:3; 95:13-15; 96:23-97:1.[35]

**E.    Sale Price**

Mr. Jaramillo testified that he was told by Mr. Lujano that Mr. Jaramillo had authorization to bid up to $675,000, although Mr. Lujano did not want to go that high.  <u>See</u> 10/6/08 Transcript, Docket #289, at 90:4-8.  Mr. Lujano, on the other hand, testified that he never made an offer on the Property and never gave Mr. Jaramillo a specific offer amount. Instead, Mr. Lujano claims he just told Mr. Jaramillo "more or less the amount that we could possibly pay."[36]  <u>See</u> 10/15/08 Transcript, Docket #291, at 20:2-21:1.

**F.    The Pre-Sale "Qualification Letter"**

Mr. Jaramillo testified that at the Sale Hearing, after pressure from Mr. Sayles, the Court requested proof that Metricz had the ability to obtain the necessary financing to purchase the Property.  <u>See</u> 10/6/08 Transcript, Docket #289, at 91:1-14.  Mr. Jaramillo testified that at a

---

30:17-18; 54:24-55:4.

[35]Mr. Jaramillo later amended his testimony to admit that he participated in the Mediation on behalf of Metricz after the sale closed and that he signed a settlement check as Metricz's president in connection with the Mediation.  <u>See</u> Section M, below.  In addition, various declarations were introduced as exhibits that purportedly contained Mr. Jaramillo's post-sale signature and identified him as the president of Metricz.  <u>See generally</u> 10/6/08 Transcript, Docket #289, at pp. 155-167; 192-196. While Mr. Jaramillo denied signing these declarations, he did admit that if Mr. Goldstein had presented him with a declaration, he would have signed it simply because Mr. Goldstein told him to.  <u>See</u> 10/6/08 Transcript, Docket #289, at 156:5-157:17.  Further, Mr. Goldstein elicited testimony which indicated that Mr. Jaramillo may have, in fact, signed some of the declarations.  <u>Id.</u> at pp. 179-182.  If these declarations were signed by Mr. Jaramillo, they would have directly contradicted his testimony that he did no further work for Metricz after the December 7, 2005 sale. Unfortunately, the exhibits were never admitted, thus the Court gives them no weight. Regardless, Mr. Jaramillo clearly had a more significant post-sale role in Metricz than he originally wanted the Court to believe.

[36]In response to the question of whether Mr. Lujano gave Mr. Jaramillo a specific price to offer for the Property at the Sale Hearing, Mr. Lujano testified, "Well, I didn't know exactly which property they were going to buy, but yes, more or less the amount that we could possibly pay.  So I think that no less than 400, but no more than maybe 680, something like that, 700, along those lines.  As I repeat, I don't remember exactly.  It's been a while and I don't remember exactly."  <u>See</u> 10/15/08 Transcript, Docket #291, at 20:21-21:1.  Possibly more curious than Mr. Lujano not being able to remember how much he offered for the Property, was his consistent use of "we" and "they" to reference a sale that was allegedly only to his corporation, Metricz.

break in the hearing, he called Mr. Lujano and requested a document from the lender showing that Metricz had approval for a loan. Id. at 127:3-128:21. Mr. Lujano allegedly told Mr. Jaramillo that Mr. Lujano would have the letter delivered to the Court.[37] Id. at 128:14-15. Subsequently, a courier arrived at the courthouse with a letter which indicated that Metricz and Mr. Lujano were approved for financing of up to $675,000 (the "Pre-Sale Qualification Letter").[38] Id. at 91:15-19; 120:11-20.

The Pre-Sale Qualification Letter was on Eagle Home Loans letterhead and was purportedly signed by Mr. McClenehan. See 9/24/08 Transcript, Docket #287, at 60:16-61:6. Mr. McClenehan testified that while it was Eagle Home Loans' letterhead and its address, he did not recall speaking to Mr. Lujano about pre-qualification and he did not believe that the signature was his. Id. at 61:1-62:16. However, Mr. McClenehan was not adamant that it was not his signature and when pressed, he declined to state affirmatively that he did not prepare the letter on behalf of Eagle Home Loans. Id. at 63:24-64:16.

Mr. McClenehan also testified that in order to pre-qualify a client, he would solicit information such as income, credit score and loan-to-value ratio. Id. at 63:2-23. He testified, however, that he would have written a pre-qualification letter based on credit score alone if Mr. Lujano had provided him with that information. Id. at 64:2-16.[39]

////

////

---

[37]Mr. Lujano could not remember speaking with Mr. Jaramillo about the Pre-Sale Qualification Letter, whether he was required to produce any paperwork to Mr. Jaramillo on the day of the sale, or whether the letter was prepared at Mr. Lujano's direction. See 10/15/08 Transcript, Docket #291, at 12:19-13:8; 14:25-15:15; 18:7-17. When shown a copy of the Pre-Sale Qualification Letter, Mr. Lujano testified that he thought he had seen the letter before, but he did not remember when, and he did not know who had prepared it. Id. at 14:18-24; 15:18-19.

[38]The Court queries how Metricz could have been "approved for financing" when Metricz had no credit history and/or credit score.

[39] Mr. McClenehan never actually obtained a credit report on Mr. Lujano until the day after the Sale Hearing. See 9/24/08 Transcript, Docket #287, at 60:2-9. Given, however, that Mr. McClenehan testified that he would write a pre-qualification letter with a verbal credit score, this fact is not determinative as to whether Mr. McClenehan actually wrote the Pre-Sale Qualification Letter.

### G. The Loan Application

Following the Sale Hearing, a loan application for the purchase of the Property was prepared (the "Application") with Mr. Lujano as the buyer.[40]  See Exhibit F.  Mr. Lujano testified that he filled out parts of the Application by himself, then went to Mr. McClenehan's office for assistance with the rest.  See 8/22/08 Transcript, Docket #270, at pp. 103-107; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 45:18-22.  Mr. Lujano also claimed that while he was at the Eagle Home Loans office, Mr. McClenehan explained the terms of the Application in English because Mr. McClenehan does not speak Spanish.  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 10:2-9.[41]  Mr. Lujano claimed that he and Mr. McClenehan were the only people present when the Application was prepared.  Id. at 9:16-10:1.  Mr. Lujano testified that he prepared and signed the Application and that all of the handwriting on the Application was his.  See 8/22/08 Transcript, Docket #270, at 102:5-19;103:3-5; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 10:10-23; 22:5-9.

Despite this testimony, Mr. Lujano knew very little about the details of the Application's preparation, or about its contents.  See generally 8/22/08 Transcript, Docket #270, at pp. 103-111.  In addition, the handwritten Application was erroneous in many material respects; none of which Mr. Lujano could explain satisfactorily.

First, on page one, under Borrower Information, the Application stated that Mr. Lujano had competed twelve (12) years of school.  See Exhibit F.  But Mr. Lujano had previously testified that he had only completed sixth grade.  See 8/22/08 Transcript, Docket #270, at 17:18-21.  When asked about the discrepancy, Mr. Lujano was unable to explain it.  Id. at 103:22-104:9.

---

[40]Although Metricz was the purported purchaser of the Property, Mr. Lujano applied for the loan as an individual.  This was allegedly because the bank would only loan to an individual and not to a business.  See 7/25/08 Transcript, Docket #269, at 36:16-21; See also, 2004 Examination of Mr. McClenehan, dated September 17, 2007, at 33:12-20.

[41]Mr. McClenehan claims that the Application was either mailed or dropped off at his office and that he does not remember assisting Mr. Lujano with the Application or meeting with him to go over the entries.  See 9/24/08 Transcript, Docket #287, at 26:11-24; 56:3-57:11.

Second, also on page one, under Borrower Information, the handwritten entry for Mr. Lujano's address was 265 N. 25th Street, San Jose, California. <u>See</u> Exhibit F. Mr. Lujano testified, however, that he had made a "mistake" and his address was actually on 26th Street. <u>See</u> 8/22/08 Transcript, Docket #270, at 104:10-19.[42]

Third, on page two, under the Assets section of the Application, one account at Bank of America was listed. <u>See</u> Exhibit F. Mr. Lujano testified that while he has "several" accounts at Bank of America, he only listed one of the accounts because he "didn't think it was necessary" to list the others. <u>See</u> 8/22/08 Transcript, Docket #270, at 107:1-9.

Fourth, and most egregious, on the second page of the Application, also under the Assets section, two accounts at Washington Mutual were listed. <u>See</u> Exhibit F. At least one of the account numbers, however, was a checking account belonging to a "Joe Guerra."[43] <u>See</u> 9/24/08 Transcript, Docket #287, at 136:5-20. When presented with evidence of this fact, Mr. Lujano testified that he wrote down the number of Joe Guerra's checking account, believing that he was listing the account number of a line of credit Mr. Lujano had taken out.[44] <u>See</u> 8/22/08 Transcript, Docket #270, at 110:1-111:9. Later, Mr. Lujano admitted that the two Washington Mutual accounts listed on the Application were not his, and in fact, were the account numbers of an "electrician" that was working on Mr. Lujano's house in San Jose. Mr. Lujano testified that this "electrician" was going to help Mr. Lujano qualify for a higher amount of financing. <u>See</u>

---

[42]The Court questions how Mr. Lujano could possibly make a "mistake" on the address of the home he had lived at for twelve years; especially where the entry was handwritten and could not be blamed on a typo. <u>See</u> Exhibit F.

[43]Mr. Guerra subsequently testified that the account belonged to his son, Joe Guerra Jr. <u>See,</u> 9/24/08 Transcript, Docket #287, at 136:5-137:11. Given Mr. Guerra's consistent lack of candor, the Court is skeptical. Further, there was testimony that this account had been used to pay Mr. Guerra's bills. Specifically, Mr. Goldstein testified that a check payable to him and drawn on this account, was for legal services that Mr. Goldstein had performed for Mr. Guerra. <u>See</u> 10/6/08 Transcript, Docket #289, at 60:22-62:4. Regardless of whether this is Mr. Guerra's account or his son's account, this is yet one more piece of irrefutable evidence of Mr. Guerra's connection with Metricz and the purchase of the Property.

[44]The Court marvels at the fact that Mr. Lujano thought the Court was gullible enough to believe it was a coincidence that out of all of the account numbers in the world, Mr. Lujano was able to "mistakenly" come up with an account number that belonged to someone named Joe Guerra.

10/15/08 Transcript, Docket #291, at 47:13-22.  When questioned further, Mr. Lujano testified that the "electrician" was none other than Mr. Guerra's son, Joey Guerra, or Joe Guerra, Jr.  Id. at 48:2-14.[45]

### H.    $25,000 Deposit

Mr. Lujano testified that he gave $25,000 in cash to Mr. de la Torre, who was to give the funds to Mr. McClenehan for the first deposit.[46]  See 8/22/08 Transcript, Docket #270, at 65:20-25; 112:18-113:2; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 45:16-17.  Mr. Lujano did not know, however, whether or how Mr. de la Torre turned the funds over to Mr. McClenehan and Mr. Lujano did not inquire because "[Mr.] de la Torre told [Mr. Lujano] that he was going to do everything and for [Mr. Lujano] to trust him.  And if he is a man of God, I'm relying to trust him."  See 8/22/08 Transcript, Docket #270, at 66:1-5.  Mr. McClenehan, on the other hand, testified that Mr. de la Torre did not deliver the $25,000 deposit.[47]  See 7/25/08 Transcript, Docket #269, at 39:5-13; 53:8-14; 9/24/08 Transcript, Docket #287, at 92:18-24; 95:13-15.  Instead, Mr. McClenehan said the deposit was delivered by a "third party" whom Mr. McClenehan could not, or would not, recall.  See 7/25/08 Transcript, Docket #269, at 48:20-49:4; 53:8-14; 71:1-14.

While the Court believes it is highly likely that the deposit was delivered to Mr. McClenehan by Mr. Guerra, it is clear that the source of the $25,000 deposit was Mr. Guerra's other son, Curtis Guerra.

Specifically, on December 8, 2005, Curtis Guerra wrote a $25,000 check to Eagle Home

---

[45]Mr. Lujano testified that he met Joey Guerra in 2003 or 2004.  When asked if Joey Guerra were one of Mr. Lujano's best friends, Mr. Lujano testified, "no."  See 10/15/08 Transcript, Docket #291, at 62:16-63:9.  When pressed as to why Joey Guerra would provide Mr. Lujano with Joey's financial information so that Mr. Lujano could qualify for a larger loan to purchase property from Avon, which was controlled by Joey's father, Mr. Guerra, Mr. Lujano began to invoke the Fifth Amendment and refused to answer any further questions on the subject.  Id. at 63:10-67:22.

[46]Mr. Lujano testified that despite the fact that he had been at Mr. McClenehan's office several times, it didn't occur to him to give Mr. McClenehan the initial $25,000 deposit personally.  See 8/22/08 Transcript, Docket #270, at 114:9-11; 114:24-115:1.

[47]Mr. McClenehan also testified that the $25,000 that he received was not in cash.  See 9/24/08 Transcript, Docket #287, at 92:18-24.

Loans. See Exhibit A at p. 1. Also on December 8, 2005, Mr. McClenehan wrote a $25,000 check made payable to Mr. Guerra from the Eagle Home Loans account. Id. at p. 2. Mr. McClenehan testified that he wrote the check to Mr. Guerra to facilitate Mr. Guerra obtaining a cashier's check for the required $25,000 deposit. See 7/25/08 Transcript, Docket #269, at 61:9-16; 73:1-14. As is reflected by the bank time and date stamps, Mr. Guerra used the $25,000 Eagle Home Loans check to purchase the $25,000 cashier's check, made payable to the Stanley A. Zlotoff Trust Account, which was used for the initial deposit required by the Sale Order. See Exhibit A at p. 2; 7/25/08 Transcript, Docket #269, at 61:24-25. Thereafter, Mr. Guerra delivered the $25,000 cashier's check to Mr. Zlotoff. See 10/27/08 Transcript, Docket #292, at 12:1-15.[48]

Mr. Guerra testified that the $25,000 check written by Curtis Guerra on December 8, 2005, was not intended to be used for the initial deposit on the Property, but instead, was an unrelated "investment" in Mr. McClenehan's business, Eagle Home Loans. See 9/24/08 Transcript, Docket #287, at 138:19-140:2. Despite his evasive and equivocal answers in other parts of his testimony, however, Mr. McClenehan testified, in no uncertain terms and at numerous different points during his testimony, that he and Curtis Guerra did not have a business relationship, there were no financial arrangements between he and Curtis Guerra, and Curtis Guerra never invested in Mr. McClenehan's business. See, 7/25/08 Transcript, Docket #269, at 32:2-5; 77:15-22; 93:10-15; 10/6/08 Transcript, Docket #289, at 77:25-78:10. In addition, after reviewing his records, Mr. McClenehan testified that there was no other transaction (i.e., loan, refinance, etc.) pending with Curtis Guerra when the check was received. See 9/24/08 Transcript, Docket #287, at 76:21-77:22. Ultimately, Mr. McClenehan admitted that Curtis Guerra's $25,000 check was the money that was used to purchase the cashier's check used for

_____

[48]Mr. Zlotoff testified that he did not deposit the $25,000 cashier's check into his trust account until approximately one month after he received it because there was uncertainty regarding whether the check that he had been given would be used. See 10/27/08 Transcript, Docket #292, at 15:13-14. Specifically, Mr. Zlotoff testified that Mr. Guerra represented to Mr. Zlotoff that the buyer's funding was in flux and there was an expectation that the check would be replaced by a different buyer or by different funding. Id. at 14: 9-15; 15:25-16:7; 46:9-11.

the initial down payment on the purchase of the Property.  <u>See</u> 9/24/08 Transcript, Docket #287, at 81:6-13.  Thus, notwithstanding Mr. Guerra's self-serving testimony to the contrary, there is sufficient competing evidence and testimony establishing that the $25,000 deposit came directly from Curtis Guerra.

### I. $100,000 Deposit

Mr. Lujano's testimony as to the $100,000 deposit was vague and inconsistent.  For example, he initially testified that he could not remember how much money he gave Mr. de la Torre after the initial $25,000 deposit, whether he made one, two, three or four additional payments to Mr. de la Torre, or when the payments were made.  <u>See</u> 8/22/08 Transcript, Docket #270, at 68:14-69:4; 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 42:3-16.  Upon further questioning, however, he was able to "remember" that he gave Mr. de la Torre the $100,000 deposit in $100 bills.  <u>See</u> 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 43:21-44:2; 46:4-8.  When asked why he didn't give the deposit directly to Mr. McClenehan, Mr. Lujano testified, "Mr. de la Torre seemed trustworthy to me.  I met him at a church.  I didn't think he was going to do anything.  He connected me.  He hooked me up with people that were taking care of this.  I thought he formed part of the whole thing, and I trusted him."  <u>Id.</u> at 47:6-14.

Mr. McClenehan testified that neither Mr. Lujano nor Mr. de la Torre personally delivered the $100,000 deposit.[49]  <u>See</u> 7/25/08 Transcript, Docket #269, at 39:5-13; 53:8-14; 9/24/08 Transcript, Docket #287, at 92:18-24; 95:13-15.  Instead, the evidence presented at the OSC hearing indicates that on January 9, 2006, Mr. McClenehan wrote a $100,000 check from his Eagle Home Loan bank account, which was used to purchase a $100,000 cashiers check.  <u>See</u>, Exhibit B at pp.1 and 4; 7/25/08 Transcript, Docket #269, at 63:21-64:5; 65:3-14; 73:15-74.  There was not a corresponding deposit into the Eagle Home Loans account prior to Mr. McClenehan writing the $100,000 check, and Mr. McClenehan admits that he advanced the

---

[49]Mr. McClenehan also testified that the $100,000 that he received was not in cash.  <u>See</u> 9/24/08 Transcript, Docket #287, at 92:18-24.

money for the purpose of obtaining the cashiers check for the required second deposit.  See Exhibit B at p. 3; 7/25/08 Transcript, Docket #269, at 76:5-77:10.[50]

Mr. Guerra brought the $100,000 cashier's check in to Mr. Zlotoff's office on January 9, 2006.  See 10/27/08 Transcript, Docket #292, at 13:9-14:5.  Mr. Zlotoff made a copy of the check and returned the original to Mr. Guerra, at Mr. Guerra's request.[51]  Id. at 13:9-14:7; 16:16-18.  Mr. Guerra returned the cashier's check to Mr. McClenahan and Mr. McClenahan re-deposited it into his Eagle Home Loans account on January 11, 2006.[52]  See, Exhibit B at pp. 2 and 3; 7/25/08 Transcript, Docket #269, at 74:20-25.

---

[50]While Mr. McClenahan initially denied advancing any funds on behalf of Mr. Lujano, he subsequently testified that he did advance the $100,000 on Mr. Lujano's behalf.  See 7/25/08 Transcript, Docket #269, at 38:18-22; 76:5-77:14.  He also testified, however, that generally when he does advance funds for clients, he has a relationship with that client.  See 9/24/08 Transcript, Docket #287, at 87:6-18.  The Court finds Mr. McClenahan's assertion that he advanced funds on behalf of Mr. Lujano to be specious.  First, Mr. Lujano claimed that he was never told what arrangements were being made to pay the $100,000.  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 43:14-20.  Second, and more importantly, Mr. McClenahan had no relationship with Mr. Lujano and had first met Mr. Lujano in 2005, in connection with this transaction.  See 7/25/08 Transcript, Docket #269, at 110:3-8.  The more likely explanation (and the only one that makes sense in the context of this case) is that Mr. Guerra asked Mr. McClenahan to advance the money and Mr. McClenahan, having worked with Mr. Guerra over many years, consented.

[51]Mr. Zlotoff explained that he returned the check to Mr. Guerra at Mr. Guerra's request, because there was uncertainty regarding whether the checks that he had been given would be used.  Specifically, Mr. Guerra told Mr. Zlotoff that the buyer was struggling, that funding was in flux and there was an expectation that a new buyer may come in and the check would be replaced.  See 10/27/08 Transcript, Docket #292, at 14: 9-15; 15:25-16:7.  Mr. Zlotoff admitted that he was stretching the terms of Judge Grube's Sale Order and that he put himself at risk by doing so, but claimed he was simply assisting in the closing of the deal.  Id. at 16:8-15; 86:5-10; 97:10-22.  When asked, Mr. Zlotoff could not come up with a coherent reason why, if the buyer was struggling and potentially on the verge of default, Mr. Zlotoff would have returned a $100,000 non-refundable deposit to Mr. Guerra, except to say, "It was foolish. . . I just trusted that [Mr. Guerra] would see to the close of escrow."  Id. at 85:15-86:4; see also 10/30/08 Transcript, Docket #293, at 30:13-18.

[52]Mr. McClenahan testified that he purchased the cashier's check, but then was told by Mr. Zlotoff that the check was not needed.  Thereafter, Mr. McClenahan testified that he re-deposited the cashier's check into the Eagle Home Loans account.  Mr. McClenahan testified that the cashier's check never left his possession.  See 7/25/08 Transcript, Docket #269, at 74:16-75:25; 9/24/08 Transcript, Docket #287, at 114:3-115:6.

Contrary to Mr. McClenahan's testimony, however, Mr. Zlotoff testified that Mr. Guerra brought the check to Mr. Zlotoff's office  and Mr. Zlotoff made a copy and returned the original check to Mr. Guerra.  See 10/27/08 Transcript, Docket #292, at 13:9-14:7; 16:16-18; 47:20-48:3.  Mr. Zlotoff's testimony is supported by the correspondence he sent to Jung Park on January 25, 2006, which attached a copy of the check.  Id. at 45:10-46:1.  Mr. Zlotoff further denies that he spoke with Mr. McClenahan regarding the $100,000 check.  Id. at 16:23-17:4; 22:3-10; 25:5-11.

**J.     Commission**

Mr. McClenehan admitted that Eagle Home Loans received a $4,000 loan broker fee, as well as an $18,300 real estate commission on the sale of the Property.  See 7/25/08 Transcript, Docket #269, at 42:14-20; 46:11-21; 48:8-13; 9/24/08 Transcript, Docket #287, at 82:24-83:1. Mr. McClenehan alleged that Eagle Home Loans was not acting as an agent for anyone on the sale of the Property and, instead, was simply acting as a loan broker.  See 7/25/08 Transcript, Docket #269, at 42:21-24; 43:2-5; 48:4-7.  He subsequently changed his testimony and testified that Eagle Home Loans was representing Mr. Lujano as the purchaser of the Property.  Id. at 46:11-24; 46:25-47:16.[53]

Mr. McClenehan's statements that Eagle Home Loans only acted as a loan broker, or that Eagle Home Loans represented Mr. Lujano as the purchaser, however, are not consistent with the other facts of this case.  Specifically, it was Mr. Guerra, acting on behalf of seller Avon, who approached Mr. McClenehan about finding a buyer for the Property, and it was Mr. McClenehan who allegedly did find the buyer.  Further, Mr. McClenehan testified that he did not take instruction from Mr. Lujano (his purported buyer client) because "[Mr. Lujano] would not have any idea."  See 7/25/08 Transcript, Docket #269, at 86:4-8.  Instead, Mr. McClenehan testified that he took his instruction from Avon's counsel, Mr. Zlotoff.[54]  Id. at 84:21-86:24.  Finally, the Seller Final Closing Statement reveals that an $18,300 commission was paid to Eagle Home Loans as the "Listing Broker."  See Seller Final Closing Statement, attached as Exhibit A to the Status Conference Statement filed by Mr. Zlotoff on 2/22/06, Docket #53.  The only possible conclusion, therefore, is that Eagle Home Loans was representing Avon as the seller and that Mr. McClenehan was taking instruction from Mr. Guerra, his friend and trusted business associate

---

[53]Interestingly, when being peppered by questions from Trustee's counsel, Mr. Tate, Mr. McClenehan changed his testimony again and admitted that Eagle Home Loans was acting as the seller's agent.  See 9/24/08 Transcript, Docket #287, at 37:9-11.

[54]Mr. Zlotoff testified, however, that he did not ever personally speak with Mr. McClenehan during the entirety of the sale transaction.  See 10/27/08 Transcript, Docket #292, at 10:8-9; 16:19-17:6; 22:3-10; 25:5-11.

1    for over twenty years.[55]

2        Mr. McClenehan also claims that he ultimately referred the real estate commission to Mr.

3    Hernandez because Mr. Hernandez requested it.[56]  See 9/24/08 Transcript, Docket #287, at

4    66:14-86:4.  When asked what Mr. Hernandez did to earn the commission, Mr. McClenehan

5    stated that he had "contacted" Mr. Lujano.  See 7/25/08 Transcript, Docket #269, at 42:14-20;

6    47:19-22; 48:1-16; 88:17-89:25; 9/24/08 Transcript, Docket #287, at 38:16-20.[57]

7        Mr. McClenehan admitted, however, that he never actually gave Mr. Hernandez the

8    commission check.  See 9/24/08 Transcript, Docket #287, at 72:7-9.  Mr. McClenehan further

9    testified that Mr. Hernandez requested that Mr. McClenehan pay the commission to Mr. Zlotoff.

10   Mr. McClenehan testified that he told Mr. Hernandez that he was not going to pay taxes on

11   money that he did not keep.  Thus, Mr. Hernandez allegedly told Mr. McClenehan to prepare an

18        [55]The Court recognizes that it is possible that Mr. Guerra told Mr. McClenehan, and therefore,
19   Mr. McClenehan acted on the assumption, that the instructions were coming from Mr. Zlotoff.  Given
     Mr. McClenehan's inconsistent testimony and apparent attempts to hide his connections and interactions
20   with Mr. Guerra, however, the Court finds it is not probable.  Regardless, whether Mr. McClenehan took
     instruction from Mr. Zlotoff or Mr. Guerra, the conclusion is the same; Eagle Home Loans was acting
21   on behalf of the seller Avon, and not on behalf of the buyer Metricz or Mr. Lujano.

22        [56]Mr. Hernandez was allegedly a director of Metricz and the person who referred Mr. Lujano to
     Mr. McClenehan.  See 7/25/08 Transcript, Docket #269, at 27:17-28:7; 9/10/08 Transcript in Case No.
23   06-5127, Docket #145, at 33:25-34:3; 9/24/08 Transcript, Docket #287, at 43:10-44:7.  It was also
     revealed at the OSC hearings and through a declaration by Mr. Hernandez, however, that Mr Hernadez
24   was a long-time friend Mr. Guerra, he had done work for Mr. Guerra, and Mr. Guerra and Mr.
     Hernandez have shared a post office box for many years.  See 10/6/08 Transcript, Docket #289, at
25   16:14-22; see also Declaration of Carlos Hernandez re Order to Show Cause, filed December 5, 2008,
     Docket #294, at ¶ 4.
26

27        [57]When asked how Eagle Home Loans could share the commission with Mr. Hernandez, who
     was not a real estate agent, Mr. McClenehan quickly backtracked and alleged that it was simply a
28   "referral fee."  See 9/24/08 Transcript, Docket #287, at 82:4-19.

IRS Form 1099 for a "Mr. Flores,"[58] but to forward the money to Mr. Zlotoff.[59] Id. at 68:5-15; 69:2-15; 72:10-22.

### K. $118,000 Shortfall After Close of Escrow

At the December 7, 2005 Sale Hearing, the Court approved the sale of the Property to Metricz for a total purchase price of $610,000. See Order Authorizing Sale Free and Clear of Interests, Docket # 41, at 2:9-19. Of that amount, $125,000 was to be from the $25,000 and $100,000 non-refundable cash deposits made on specified dates, and $485,000 was to be funded through a loan paid by close of escrow. Id. After payment of Long Beach Mortgage Company's deed of trust, the County of San Joaquin property taxes, a 3% realtor's commission and normal closing costs, the remainder of the funds (expected to be approximately $300,000) were to be placed in Mr. Zlotoff's trust account, with no funds to be disbursed without further order of the Court. Id. at 2:23-3:7. Escrow was to close no later than February 9, 2006. Id. at 2:17-18.

Escrow closed on February 3, 2006. See Declaration of Mohamed Poonja in Support of Motion to Approve Compromise of Controversy, Docket #136, at 7:7. On the day that escrow closed, Mr. Zlotoff sent the title company instructions for disbursement of the remaining funds, despite the fact that he had not received and/or deposited the $100,000 nonrefundable deposit into his trust account, and despite the fact that he had not obtained an order from the Court, authorizing transfer of the funds. See 10/27/08 Transcript, Docket #292, at 103:23-105:9.

Subsequently, Mr. Zlotoff received the closing statement and a check for $167,774.90 from the title company. It was then that Mr. Zlotoff realized that the sale had closed, despite a

---

[58] Mr. McClenehan testified that he did not know who Mr. Flores was, had never met Mr. Flores and had never spoken with Mr. Flores. See 9/24/08 Transcript, Docket #287, at 69:23-24; 70:2-3; 73:9-13. Despite this, Mr. McClenehan allegedly agreed to issue a form 1099 to a man he had never met, for funds Mr. Flores never received. Id. at 69:16-22. Interestingly enough, while Mr. McClenehan admitted to instructing his accountant to issue the 1099 to Mr. Flores, Mr. McClenehan was unable to produce a copy of the 1099 because, due to a fortuitous clerical error at the accountant's office, the accountant never sent it out. Id. at 73:6-8; Declaration of Howard Hildreth, Docket #288, at ¶ 4.

[59] The Declaration of Carlos Hernandez, which was procured by Mr. McClenehan, mentions nothing about the commission, Mr. Hernandez's alleged request to receive the commission, or Mr. Hernandez's subsequent request that the commission be paid to Mr. Zlotoff. See Declaration of Carlos Hernandez, Docket #294. It seems that if Eagle Home Loans really did refer the commission to Mr. Hernandez, this would have been addressed by the Hernandez Declaration.

shortage in the purchase price of $118,277.11.[60]  See 10/27/08 Transcript, Docket #292, at 17:19-22; 21:13-17; 67:14-68:5.  Thereafter, Mr. Zlotoff called Mr. Guerra and followed up with a letter confirming that Mr. Guerra would bring Mr. Zlotoff a cashier's check for the shortage amount.  Id. at 17:23-18:6; 21:18-20; 32:12-19.

On February 21, 2006, a check drawn on Curtis Guerra's account, in the amount of $100,277.11, was issued to Eagle Home Loans.[61]  See Exhibit C at p. 1; 7/25/08 Transcript, Docket #269, at 66:16-67:6; Further Supplemental Responsive Declaration of James McClenehan to Order to Show Cause, Docket #272, at ¶ 2.  Mr. McClenehan testified that while he thought it was odd that Eagle Home Loans would receive such a check after escrow had closed, he didn't recall having any discussions with anyone or asking any questions of any of the parties regarding the check because "[t]he transaction was closed.  I wasn't interested in it."  See 9/24/08 Transcript, Docket #287, at 93:9-94:6.

Despite "not remembering" any discussions with anyone regarding the check, Mr. McClenehan testified that on the same date, he wrote a check in the amount of $118,277.11,

_____

[60]The Seller Final Closing Statement reflected $118,277.11 in "Funds received from buyer - Credit."  See Seller Final Closing Statement, attached as Exhibit A to the Status Conference Statement filed by Mr. Zlotoff on 2/22/06, Docket #53.  Mr. McClenehan testified that he, as the individual who had been procuring the cashiers checks for the required deposits, had not paid the $118,277.11 into the escrow account.  See 9/24/08 Transcript, Docket #287, at 134:9-23.  Mr. Zlotoff also testified that he never represented to the escrow company that there was $118,277.11 in his trust account, to be credited to the purchase price.  See 10/27/08 Transcript, Docket #292, at 49:11-14.

Mr. Zlotoff testified that he thought it was odd that escrow could close without the $118,000 in funds being deposited and that he never got a satisfactory explanation from the title company as to why that had occurred.  Id. at 18:9-14.  Despite this, however, Mr. Zlotoff testified that he did not discuss the matter with Mr. Guerra or anyone else, nor did he take any steps to inform the Court of the irregularity, even though there was a status conference scheduled for February 24, 2006, and he testified that he was uneasy about having to tell the Court that the sale had closed and that the estate was short of funds.  Id. at 18:21-25; 21:1-10; 31:23-25; See also Status Conference Statement filed by Mr. Zlotoff on 2/22/06, Docket #53 (wherein Mr. Zlotoff simply states, "The sale of debtor's real property located in Lathrop, California closed. . . . All funds including those designated as credits have been paid to the undersigned to be held in trust.")

The Court suspects that it was Mr. Guerra who authorized the closing of the escrow, despite the fact that the $118,277.11 had not been paid.

[61]Mr. Lujano testified that no one told him that Curtis Guerra wrote a $100,000 check as part of the purchase of the Property, and that he did not know why Curtis Guerra would have written such a check.  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 47:24-48:10; 49:9-14.

payable to the Bank of Santa Clara.[62]  See Exhibit C at p. 2; 7/25/08 Transcript, Docket #269, at 67:14-68:2; 79:10-80:3.  Mr. McClenehan admitted that the check was then used to purchase a cashier's check, also dated February 21, 2006, in the amount of $118,277.11, made payable to the Stanley A. Zlotoff Trust Account.  See Exhibit C at p. 3; 7/25/08 Transcript, Docket #269, at 68:7-21; Further Supplemental Responsive Declaration of James McClenehan to Order to Show Cause, Docket #272, at ¶ 1.  Mr. McClenehan also admitted that this $118,277.11 cashier's check was made up of the $100,277.11 from Curtis Guerra, plus the $18,000 real estate commission.[63]  See Further Supplemental Responsive Declaration of James McClenehan to Order to Show Cause, Docket #272, at ¶ 2. Subsequently, Mr. Guerra delivered the $118,277.11 cashier's check to Mr. Zlotoff's office.  See 10/27/08 Transcript, Docket #292, at 19:1-7.  Mr. Zlotoff never asked Mr. Guerra about the source of the money.  Id. at 20:23-25; 27:2-3.

## L.    Retention of Mr. Goldstein by Metricz

At some point, Metricz[64] learned that the Sewer Hookups entitlements on the Property had been terminated by the County of Lathrop.  At that point, Metricz hired Mr. Goldstein to file the Adversary Proceeding.[65]

---

[62]As detailed below, it was apparent to the Court from Mr. McClenehan's evasive testimony, that he was knowingly attempting to hide the true source of the funds used for the non-refundable deposits. What is not clear was whether Mr. McClenehan knew of the significance of this deception to the Court.

[63]Mr. McClenehan initially testified that he did not know where the additional $18,000 came from.  See 7/25/08 Transcript, Docket #269, at 87:1-22.  He later testified that the $18,000 was, in fact, the commission on the sale of the Property, but he claimed that Mr. Hernandez instructed him to pay the funds to Mr. Zlotoff because it was Mr. Hernandez's commission.  See 9/24/08 Transcript, Docket #287, at 33:17-34:14; 35:15-25.  As stated previously, no evidence supports Mr. McClenehan's position that the commission was referred to Mr. Hernandez.  Even if the Court were to accept that the commission was referred to Mr. Hernandez, however, the Court notes that the full amount of the commission was $18,300.  Thus, Mr. McClenehan's position does not address the question of where the other $300 went.  Given no evidence to the contrary, the Court can only presume that it stayed with Mr. McClenehan.

[64]To avoid confusion, the Court uses "Metricz" when talking about actions allegedly taken by Metricz.  The Court believes, however, that all actions taken by Metricz, were in fact taken by or directed by, Mr. Guerra.

[65]In response to the question why Metricz decided to hire counsel, Mr. Lujano testified that he did so because "they started accusing me of something I knew nothing about. I just wanted to buy some property and they got me involved in all this."  See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 28:4-6.  The Court can only guess who "they" are, but finds the response odd.

Initially, Mr. Lujano testified that he got Mr. Goldstein's name when he called information. See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 27:12-19. Later, he agreed that he had picked Mr. Goldstein's name out of the Yellow Pages. Id. Subsequently, he changed his story a third time and testified that he got Mr. Goldstein's information "from 'the people' who were assisting [him] with the purchase of the Property." Id. at 50:18-51:10 (internal quotations added). When pressed further, he testified that he believed that either Mr. de la Torre or Mr. Jaramillo told him to call Mr. Goldstein.[66] See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 51:13-19; 57:7-10. Mr. Lujano's various stories regarding how he came to choose Mr. Goldstein, were unbelievable.[67]

## M.    The Mediation

As indicated previously, on August 2, 2007, after the Trustee's appointment, and in an attempt to resolve various disputes, the Trustee, Metricz, Mr. Guerra, the Aguilar Trustee and Mr. Aguilar's parents participated in a mediation conducted by the Honorable Thomas E. Carlson (previously defined as the "Mediation"). See Motion to Approve Compromise of Controversy, Docket #135; Status Conference Statement in Case No. 06-5127, Docket #52, at 2:6-9. Mr. Goldstein and Mr. Jaramillo attended the Mediation on behalf of Metricz. See 10/6/08 Transcript, Docket #289, at 108:17-109:22.

Prior to the Mediation, Mr. Goldstein informed Mr. Jaramillo that Mr. Jaramillo needed to appear on behalf of Metricz. See 10/6/08 Transcript, Docket #289, at 111:5-14. Mr. Jaramillo allegedly told Mr. Goldstein that he was no longer president of Metricz and did not want to

---

[66]Mr. Jaramillo claims that he did not meet Mr. Goldstein until right before the Mediation. See 10/6/08 Transcript, Docket #289, at 109:12-13; 10/30/08 Transcript, Docket #293, at 75:23-76:25. Thus, he could not have referred Mr. Lujano to Mr. Goldstein. In addition, Mr. Goldstein testified that he has never seen or met Mr. de la Torre. See 10/6/08 Transcript, Docket #289, at 74:2-13. Thus, it does not appear that Mr. de la Torre referred Mr. Lujano to Mr. Goldstein.

[67]The Court believes that Mr. Lujano's varied and unbelievable accounts of how he found Mr. Goldstein were all attempts to avoid stating the truth; that it was Mr. Guerra who referred Mr. Lujano to Mr. Goldstein. It seems virtually impossible that given all of the lawyers in San Jose and the South Bay, Mr. Lujano, who lived and worked in San Jose, would retain a sole practitioner from the East Bay. Further, Mr. Goldstein had an established relationship with Mr. Guerra and was representing Mr. Guerra in unrelated matters at the time. The Court finds Mr. Lujano's testimony on this point to be false.

attend the Mediation. Id. at 111:15-20. Mr. Jaramillo claims that he was told by Mr. Goldstein that he remained Metricz's President and that he had to attend the Mediation. Id. at 111:10-24. Mr. Jaramillo claims that while he did ultimately attend, he had no part in the negotiations, did not discuss the litigation with Mr. Goldstein,[68] and approved the settlement on Metricz's behalf solely based on Mr. Goldstein's advice.[69] Id. at 109:11-22; 112:3-18; 114:8-12; 134:6-17; 149:8-15.

Pursuant to the settlement reached in the Mediation, the Trustee issued a check for administrative expenses in the amount of $25,000 to Metricz. See Declaration of Samuel E. Goldstein re Deposit of Payment to Metricz in Case No. 06-5127, Docket #93, at ¶ 2. Mr. Goldstein claims that he arranged for Mr. Lujano to endorse the check, but Mr. Lujano was unavailable. Id. at ¶ 3. Subsequently, Mr. Goldstein, accompanied by Mr. Guerra, went to Mr. Jaramillo's restaurant and told Mr. Jaramillo to sign the check.[70] Id.; 10/6/08 Transcript, Docket #289, at 112:18-113:12; 131:16-132:5. Pursuant to Mr. Goldstein's instruction, Mr. Jaramillo did endorse the check. See 10/6/08 Transcript, Docket #289, at 112:15-22.

////

---

[68] Mr. Goldstein disputes Mr. Jaramillo's recollection and insists that he spent substantial time explaining to Mr. Jaramillo the Adversary Proceeding, the underlying facts, the proposals made to resolve it, and Metricz's settlement stance. See Declaration of Samuel E. Goldstein re Communications with Robert Jaramillo in Case No. 06-5127, Docket #99, at ¶¶ 22 and 24. The Court does not know whose recollection of events is correct. If Mr. Jaramillo is being truthful about his involvement in the settlement negotiations, the Court queries who negotiated and made decisions on Metricz's behalf at the settlement? If Mr. Jaramillo is not being truthful, he clearly had more post-sale involvement in Metricz than he would admit to.

[69] Mr. Lujano testified that he had no knowledge of the Mediation, and that he simply "[gave] authorization for whatever had to be done to be done." See 10/15/08 Transcript, Docket #291, at 8:4-21. When pressed on the matter, Mr. Lujano claimed that he gave Mr. Jaramillo authorization to proceed with the lawsuit. Id. at 8:22-9:5. When asked why he didn't personally attend the Mediation, he testified that he "wasn't told [he] had to go." Id. at 9:20-23. Mr. Lujano did not know who went to the Mediation on Metricz's behalf, nor did he know the terms of the settlement. Id. at 9:24-10:10.

[70] Interestingly, when Mr. Jaramillo first testified about signing the check, he made no mention of the fact that Mr. Guerra accompanied Mr. Goldstein to the restaurant. It was not until Mr. Tate specifically asked who was with Mr. Goldstein that Mr. Jaramillo admitted Mr. Guerra's attendance. See 10/6/08 Transcript, Docket #289, at 112:18-113:12.; 131:16-132:5. Mr. Goldstein similarly failed to disclose Mr. Guerra's presence. See Declaration of Samuel E. Goldstein re Deposit of Payment to Metricz in Case No. 06-5127, Docket #93, at ¶ 3.

### N.     Status of the Property and Metricz

Since the sale, various events regarding Metricz and the Property have taken place.  First, after the sale closed, Mr. Lujano entered into discussions with Mr. Guerra to develop the Property.  See 10/15/08 Transcript, Docket #291, at pp. 82-85.  It is unclear whether Mr. Guerra and Mr. Lujano came to any agreement regarding development, or whether any development occurred.

Second, on or about November 10, 2008, Metricz lost the Property to foreclosure. See Metricz's Closing Memorandum of Points and Authorities in Response to the Court's OSCS [sic], Docket #297, at 7:4-5.

Third, on April 19, 2010, the Adversary Proceeding was dismissed for lack of prosecution.  See Order Taking Trial Off Calendar and Dismissing Adversary Proceeding for Lack of Prosecution in Case No. 06-5127, Docket #139.  Metricz currently has no known assets.[71]

Finally, review of the California Secretary of State website indicates that Metricz is a suspended California Corporation.[72]  It is not clear how long Metricz has been a suspended corporation.

### III.     DISCUSSION

### A.     Introduction

The tales woven by the parties to this proceeding are complicated, inconsistent, and in many respects, unbelievable.  The one common factor, however, is Mr. Guerra.  All parties and their actions lead back to him.  Despite the fact that Mr. Lujano, Mr. McClenehan, Mr. Jaramillo and Mr. Goldstein all actively assisted Mr. Guerra in his efforts to hide his connection to Metricz from the Court, the inevitable conclusions are: (1) Mr. Guerra orchestrated Metricz's purchase of the Property; and (2) not only did Mr. Guerra have a connection to Metricz that he failed to

---

[71]See Metricz's Closing Memorandum of Points and Authorities in Response to the Court's OSCS [sic], Docket #297, at 8:11-12.

[72]See California Secretary of State Website, Business Search, http://kepler.sos.ca.gov/cbs.aspx (last visited July 15, 2010).

... 

disclose, he, in fact, **was** Metricz. Mr. Guerra was also fortuitous to have substantial (if unintentional) assistance from Mr. Zlotoff, who appears to have set aside his professional judgment and abdicated his fiduciary duties to the estate and his duties as an officer of the Court. In the process, Mr. Zlotoff unknowingly aided Mr. Guerra in his dishonest endeavor. While the Property ultimately appears to have sold for an amount that was equal to, or greater than its value, the end result was a grave harm to the Bankruptcy Estate by virtue of the fact that the Trustee and his counsel were required to spend large amounts of time and money attempting to figure out exactly what happened. This is money that could have and should have gone to creditors. Perhaps the bigger concern, however, is the violation committed by the parties against the integrity of the bankruptcy system. For these and the following reasons, the Court intends to utilize its inherent powers to sanction the parties and to compensate the estate for the losses it has suffered as a direct result of the parties' obstructive actions.

**B.    Witness Credibility**

The question to be answered by this OSC was whether there were any undisclosed connections between Mr. Guerra and Metricz, and whether the parties attempted to conceal any such connections. The key evidence in this proceeding was from witness testimony that, in many respects, conflicts materially with other witness testimony and with the documentary evidence. Accordingly, the credibility of the witnesses is a significant factor in the Court's analysis and ultimate conclusion.

Where the testimony of a witness is not believed, the trier of fact may simply disregard it. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984). The Court's determinations regarding credibility are given due regard on appeal. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985).

After hearing the conflicting and ever-changing stories of the witnesses over many days of testimony, the Court has concluded that for various reasons, most of the witnesses did not testify truthfully in many material respects. The end result is that the Court was hamstrung in its

1   ability to determine the true facts surrounding the sale of the Property.[73]  Despite this pervasive

2   lack of candor, however, the Court found some witnesses to be slightly more credible than others

3   and thus, affords their testimony greater weight.

4               **1.      Joe Guerra**

5               Mr. Guerra was not a credible witness and his blatant misrepresentations about the most

6   mundane topics casts doubt on all of his testimony.

7               In his declaration in support of the Motion to Sell the Property, Mr. Guerra represented,

8   under penalty of perjury, that he had no connections with anyone involved with Metricz or the

9   sale to Metricz.  At the Sale Motion hearing, in response to concerns of the Court and the parties

10  about an insider connection, Mr. Guerra represented to Ms. Dumas that he had no connections

11  with anyone involved in Metricz.  Mr. Guerra also sat silently by, allowing Ms. Dumas to

12  represent to the Court that, "[Mr. Guerra] said he has no connections with Mr. Jaramillo, the

13  president of Metricz Corporation. . . . Mr. Guerra told me he has no connections with Carlos

14  Hernandez, who is. . . one of the shareholders of Metricz[.]  Mr. Guerra says . . . he doesn't know

15  any of these people, he's never met them, he's never seen them.  He has no prior connection."

16  Unfortunately for Mr. Guerra, the facts that came to light during the course of this OSC show

17  just how blatant these misrepresentations were.

18              Specifically, despite telling Ms. Dumas at the Sale Hearing that he had no connection

19  with Mr. Jaramillo, there was testimony at the OSC hearings that Mr. Jaramillo works for

20  attorney Thomas Salciccia, Mr. Guerra is a client of Mr. Salciccia's, Mr. Jaramillo has worked

21  on Mr. Guerra's file, Mr. Guerra periodically worked in Mr. Salciccia's office, and following the

22  sale, Metricz mail came to Mr. Salciccia's office and Mr. Jaramillo left the mail to be picked up

23  by Mr. Guerra.  See 10/6/08 Transcript, Docket #289, at 97:5-98:24; 183:21-185:14; 10/27/08

24  Transcript, Docket #292, at 54:4-55:2.

---

[73]The Court is also hamstrung in one other important respect.  Many exhibits were introduced
during the course of the OSC hearings.  Few of them, however, were admitted (or requested to be
admitted) and many were subject to objection.  Thus, documents that were potentially helpful cannot
be used by the Court.  Where possible, the Court has utilized the testimony of the parties regarding these
non-admitted documents.  Unfortunately, in many cases, the testimony is significantly less helpful than
the documents themselves would have been.

Further, despite telling Ms. Dumas that he had no connection with Mr. Hernandez and allowing Ms. Dumas to repeat that representation to the Court, Mr. Guerra testified at the OSC hearing that he has known Mr. Hernandez for ten years and that Mr. Hernandez has done work for Mr. Guerra in the past.  <u>See</u> 10/6/08 Transcript, Docket #289, at 16:14-22.  A declaration signed by Mr. Hernandez indicates an even closer relationship; Mr. Guerra and Mr. Hernandez are friends and have shared a post office box "for many years."  <u>See</u> Declaration of Carlos Hernandez re Order to Show Cause, Docket #294, at ¶ 4.

Mr. Guerra also testified at his Rule 2004 examination that he did not know how Mr. Zlotoff came to possess $300,000 in total sale proceeds, when he only received $167,000 in proceeds from the title company at the closing of the sale, and that Mr. Zlotoff never requested that Mr. Guerra obtain further funds to replenish the estate.  <u>See</u> Deposition of Joe Guerra, dated July 19, 2007, at 113:25-116:1.  When asked about it at the OSC, Mr. Guerra invoked the Fifth Amendment.  <u>See</u> 10/6/08 Transcript, Docket #289, at 45:8-48:21.  Mr. Guerra's 2004 examination testimony, however, was contradicted by Mr. Zlotoff's testimony that after escrow closed, Mr. Zlotoff received the closing statement from the title company and realized that there was a shortage of $118,277.11.  Thus, Mr. Zlotoff  contacted Mr. Guerra and made arrangements for Mr. Guerra to bring a cashier's check for the shortage amount.  <u>See</u> 10/27/08 Transcript, Docket #292, at 17:19-18:6; 21:13-20; 32:12-19; 67:14-68:5.  Mr. Zlotoff testified that subsequently, Mr. Guerra delivered the $118,277.11 cashier's check to Mr. Zlotoff's office.  <u>Id.</u> at 19:1-7.

Finally, in the most puzzling of mistruths, in his deposition, Mr. Guerra denied that Mr. Goldstein referred him to Mr. Zlotoff to represent Avon in this bankruptcy.  <u>See</u> Deposition of Joe Guerra, dated July 19, 2007, at 227:18-25.  This testimony was contradicted by both Mr. Zlotoff and Mr. Goldstein.  <u>See</u> 10/6/08 Transcript, Docket #289, at 62:16-63:2 (Mr. Goldstein testified that he referred Mr. Guerra to Mr. Zlotoff to represent Avon in the bankruptcy); 10/30/08 Transcript, Docket #293, at 35:19-37:22 (Mr. Zlotoff testified that Mr. Goldstein referred Mr. Guerra to Mr. Zlotoff to represent Avon in the bankruptcy).  Mr. Guerra's unwillingness to tell the truth about such an inconsequential matter highlights the reason why the

Court found him not to be a credible witness.

## 2. James McClenehan

Mr. McClenehan did not appear at the December 7, 2005 Sale Hearing, nor did he file any papers with the Court making any representations relating to the sale.[74] His presence as a party to this OSC was largely a function of the fact that Mr. Guerra allegedly approached Mr. McClenehan to obtain a buyer for the sale of the Property and ultimately, Mr. McClenehan obtained a buyer, arranged the loan for Mr. Lujano and received a loan broker's commission, as well as a real estate commission from the proceeds of the sale. See 7/25/08 Transcript, Docket #269, at 26:15-29:22; 34:1-35:15. Thus, the Court required information regarding how the sale came about and the extent of Mr. McClenehan's involvement and knowledge.

Mr. McClenehan appeared to the Court to be a somewhat credible witness, although evasive on some points and inconsistent on others. For example, when asked whether he had any business transactions with Curtis Guerra, Mr. McClenehan originally stated unequivocally that he did not have any such transactions, but then changed his testimony to state that after the Property was sold, Eagle Home Loans had arranged a loan for Curtis Guerra to purchase an investment property. See 7/25/09 Transcript, at 31:25-32:13; 52:1-8. He subsequently filed a declaration in which he stated that Eagle Home Loans had brokered a loan for Curtis Guerra, which closed in March 2004. See Responsive Declaration of James McClenehan to Order to Show Cause, Docket #263, at ¶ 3. In addition, Mr. McClenehan was evasive about whether he advanced monies for the purchase of the Property; first testifying that he never did so under any circumstances, then admitting that he did advance funds to clients regularly and, in fact, had advanced funds in this case. See 7/25/09 Transcript, at 38:18-22; 40:8-41:6; 76:5-77:14.

Interestingly, Mr. McClenehan's recollection of certain events was vague as to some facts, and crystal clear as to others, even when those events occurred on the same day or in the same transaction. For example, with regards to the initial $25,000 deposit, Mr. McClenehan

---

[74]While there were allegations that the Pre-Sale Qualification Letter was authored and signed by Mr. McClenehan, it was not clear to the Court that this was actually the case. Further, the Pre-Sale Qualification Letter was never actually presented to the Court.

testified that he did not recall the check from Curtis Guerra arriving at his office, or what the Curtis Guerra check was for, but he clearly recalled writing Mr. Guerra a check to purchase a cashier's check and remembered that he did so because he was too busy to purchase the cashier's check himself. Id. at 49:1-4; 53:8-14; 71:1-14; 73:1-14; 104:11-106:18.

The Court is under the impression that some of the evasiveness, inconsistency and selective recall may have resulted from the fact that Mr. McClenehan was the first witness to testify in this proceeding, testified multiple times throughout the proceeding, and may have been second-guessing actions he routinely performs, which were improper, or that he believed may have been construed to be improper in the bankruptcy context. The Court also notes that Mr. McClenehan testified that he has known Mr. Guerra for twenty-five years, Mr. Guerra has referred many clients to Mr. McClenehan over the years, and Eagle Home Loans had arranged numerous loan for Guerra family members. Id. at 29:23-31:15; 10/6/08 Transcript, Docket #289, at 15:6-16:13. Thus, his inconsistent and evasive testimony may have been the result of an attempt to assist a business contact who has referred many clients (and the associated commissions) over the years.[75]

### 3. Raymundo Lujano

Mr. Lujano was not a credible witness. He knew little to nothing about the Property or its purchase (even though it was purportedly purchased by him).[76] He spun a tale of people who had never been seen by anyone else but him and could not be contacted by him[77] and of cash that

---

[75]This desire to assist Mr. Guerra is supported by Mr. McClenehan's testimony that in his career, prior to the sale of the Property, Mr. McClenehan had only handled five sale transactions and that the sale of the Property was the only sale transaction that he had been involved in as an agent involving a bankruptcy proceeding. See 7/25/08 Transcript, Docket #269, at 56:18-57:2.

[76]See generally 10/15/08 Transcript, Docket #291, at 12:11-17:18 (wherein Mr. Lujano testified in various ways that he did not know the specifics of the sale and then testified that "I didn't ask for any details. I don't even know how all this works"); 18:18-19:24 (wherein Mr. Lujano did not know the details regarding how the Property was transferred from his name to Metricz).

[77]See 8/22/08 Transcript, Docket #270, at 83:12-84:9 and 10/15/08 Transcript, Docket #291, at 68:24-69:8, wherein Mr. Lujano describes Mr. de la Torre as a generic dark-skinned male who comes and goes from Mexico, does not have a phone number, and is only seen periodically in church. Despite the elusive nature of Mr. de la Torre, Mr. Lujano trusted Mr. de la Torre implicitly and allegedly gave him upwards of $150,000 in cash to purchase a property that Mr. Lujano had never seen, no questions asked, all because Mr. de la Torre was a "man of [G]od" and Mr. Lujano "trusted him."

could not be traced, in an attempt to make this Court believe that he, in fact, orchestrated and purchased the Property.  His testimony was unbelievable in all respects and the Court gives it little weight.

### 4.    Robert Jaramillo

The Court did not find Mr. Jaramillo to be credible.  Mr. Jaramillo testified that he has a law degree and practiced law in California for twenty-five years before resigning from the bar.[78] See 10/6/08 Transcript, Docket #289, at 109:23-110:9.  The Court does not believe that a lawyer with twenty-five years of experience would agree to be president of a corporation for a day, without any documentation.  Nor does the Court believe that such an experienced attorney would attend a Mediation and sign off on a settlement agreement or sign a declaration under penalty of perjury simply because Mr. Goldstein told him to do so.[79]

Mr. Jaramillo's veracity is also called into question as a result of his comments and conduct at the Sale Hearing.  At the OSC hearing, Mr. Jaramillo purported to have known little to nothing about the sale, the Property and/or Metricz.  His remarks at the Sale Hearing, however, were quite specific as to the details of the transaction and the involved parties.[80]  The

[78]Mr. Jaramillo resigned from the California bar, with charges pending.  See 10/6/08 Transcript, Docket #289, at 171:10-22.

[79]See 10/6/08 Transcript, Docket #289, at 156:5-157:17, wherein Mr. Jaramillo testified that if Mr. Goldstein had presented him with a declaration stating that at all times relevant, Mr. Jaramillo was president of Metricz, he would have signed it simply because Mr. Goldstein told him to do so.

[80]Among the comments made by Mr. Jaramillo at the Sale Hearing were:

"I do a lot of real estate in Lathrop, you know.  That's where . . . I'm located.  There's a - no acre of land that, you know, it's zoned in this zoning of other units that will sell for 590.  So when it comes down to appraisal, it's probably not going to appraise for 590, . . . maybe 575 . . . at the most. . . . [I]f they keep on bidding . . . higher, no one is going to get a loan unless they put . . . a bigger down payment down."

See Transcript of 12/7/05 Sale Hearing, Docket #191, at 16:11-23.

"Now, like I said, I do a lot of transactions in Lathrop.  Just eight months ago, I saw an acre right across the street from this property for . . . $325,000.  And like I said prior to this, is that the moneys that is [sic] starting to be offered on this property is going to be way above appraisal."

Id. at 38:8-13.

In addition, Ms. Dumas represented the following on behalf of Mr. Jaramillo:

only conclusion the Court can draw is that Mr. Jaramillo's comments at the Sale Hearing were either truthful, or were intended to instill a false sense of confidence in the Court regarding Metricz's legitimacy, if not intended to mislead Judge Grube outright.  Either way, Mr. Jaramillo's remarks at the Sale Hearing raise questions about the credibility of his testimony at the OSC.

Finally, the Court has the distinct impression that Mr. Jaramillo had a much closer relationship with Mr. Guerra than he would admit, and likely knew that Mr. Guerra was orchestrating the sale and purchase of the Property (even if he was not aware of the significance).[81]  Unfortunately, that appears to the Court to have resulted in Mr. Jaramillo being less than truthful about what he did and what he knew.  The end result is that his testimony is not credible.

////

////

---

"Mr. Jaramillo, who represents Metricz Corporation, has said he would. . . be able to put down $116,000 within 30 days."

Id. at 6:13-15.

"Mr. Jaramillo did not bring a prequalification letter, but he has represented he would be able to present one . . . by four o'clock this afternoon.  However, he does not have it now.  And he said that the reason he did not bring it with him is because he didn't know what the final amount would be, what the final sale amount was . . . because he knew he was getting into a bidding situation.  So he wanted to make sure that his letter had the actual amount of the actual loan if he was going to be the prevailing bidder

Id. at 6:24-7:7.

None of the statements made by Ms. Dumas were contradicted, clarified, or amended by Mr. Jaramillo.

[81]Specifically, Mr. Jaramillo worked for Mr. Salciccia, and Mr. Guerra was a client of Mr. Salciccia.  Mr. Jaramillo worked on Mr. Guerra's file at Mr. Salciccia's office.  Mr. Guerra claims to also have worked for Mr. Salciccia.  Most damning, however, is the fact Mr. Jaramillo admitted that after the sale to Metricz closed, mail for Metricz began to arrive at Mr. Salciccia's office and Mr. Jaramillo set it aside for Mr. Guerra.  See 10/6/08 Transcript, Docket #289, at 185:13-14.  When asked why he would set the mail aside for Mr. Guerra and not give it to Mr. Lujano, Mr. Jaramillo testified, "I just know he was . . . involved with this whole business[.] . . .[W]e have a number of corporations that come into the office.  We don't know who they belong to, and we leave them for Joe. . . . I presumed Joe Guerra was involved with Metricz. . . . [It's] just the way Joe does things. . . . I just believe Joe uses corporations instead of himself.  That's my belief. . . . He likes to use corporations.  He likes to develop properties for corporations. . . .[T]hat's his modus operandi."  Id. at 186:21-189:10.

### 5. Samuel Goldstein

While Mr. Goldstein represented Metricz at the OSC hearings, he appeared to be more interested in representing Joe Guerra. See 9/24/08 Transcript, Docket #287, at 122:20-124:25 (Mr. Goldstein questioning Mr. McClenehan and attempting to elicit testimony that Joe Guerra, Jr.'s bank account was not Mr. Guerra's bank account); 10/6/08 Transcript, Docket #289, at 48:6-49:9 (Mr. Goldstein objecting when Mr. Tate questioned Mr. Guerra regarding the $118,000 shortfall); 10/30/08 Transcript, Docket #293, at 88:16-89:13; 90:1-10 (Mr. Goldstein objecting to Mr. Tate's questioning of Mr. Jaramillo regarding Mr. Jaramillo's practice of leaving Metricz mail that came to Mr. Salciccia's office, for Mr. Guerra to pick up); 12/15/08 Transcript, Docket #295, at 33:10-34:21 (Mr. Goldstein arguing that signature cards for bank accounts in Curtis Guerra's and Joe Guerra, Jr.'s names were not signed by Mr. Guerra, hypothesizing about Mr. Guerra's use of his son's bank accounts, and hypothesizing (without any evidence or supporting testimony from Mr. Lujano) that Curtis Guerra may have actually received $25,000 in cash from Mr. Lujano). This could be due to the established relationship that Mr. Goldstein had with the Guerra family. See 10/6/08 Transcript, Docket #289, at 61:1-25 (Mr. Goldstein represented Mr. Guerra in connection with adversary proceeding); 62:5-15 (Mr. Goldstein represented Curtis Guerra in state court action); 62:16-63:2 (Mr. Goldstein referred Mr. Guerra to Mr. Zlotoff to represent Avon in its bankruptcy).

Mr. Goldstein's true loyalties were also revealed when: (1) Mr. Jaramillo testified that Mr Goldstein brought Mr. Guerra with him to Mr. Jaramillo's restaurant to have Mr. Jaramillo sign the Metricz settlement check (See 10/6/08 Transcript, Docket #289, at 131:16-132:5)[82]; (2) Mr. Goldstein testified that prior to obtaining Mr. Jaramillo's e-mail address, he would send documents and/or information to Mr. Guerra, because "[Mr. Guerra] knew where Mr. Jaramillo could be located," (See 10/30/08 Transcript, Docket #293, at 109:22-110:9); and (3) Mr. Goldstein testified that information for at least one declaration "may have come indirectly from

---

[82]Oddly enough, when Mr. Goldstein was recounting the events surrounding the endorsement of the settlement check, he never mentioned that he took Mr. Guerra with him to have it signed. See Declaration of Samuel E. Goldstein re Deposit of Payment to Metricz in Case No. 06-5127, Docket #93, at ¶ 3.

Mr. Lujano through Mr. Guerra," (Id. at 112:21-24).[83][84]

The Court finds it curious that of all the lawyers in the South Bay, Mr. Lujano chose Mr. Goldstein (whose office is in the East Bay and who had an established relationship with Mr. Guerra) to represent Metricz. Mr. Lujano testified that it was Mr. Jaramillo who recommended Goldstein.[85] See 10/15/08 Transcript, Docket #291, at 75:4-10. The Court is skeptical. Regardless, this "coincidence" in Metricz's choice of lawyer, combined with Mr. Goldstein's connections with Mr. Guerra and Mr. Goldstein's actions during the OSC indicate that Mr. Goldstein's loyalties were not solely to Metricz and that his testimony and comments to the Court were less than candid.

### 6. Stanley Zlotoff

The Court found Mr. Zlotoff to be a credible witness to the extent that he was able to testify. As was very evident, however, Mr. Zlotoff's record-keeping and monitoring of this case were less than ideal. See generally 10/27/08 Transcript, Docket #292, at pp. 29-30; 35-40; 43-44. Thus, any inconsistencies or inaccuracies in his testimony appear to be more a function of his lax handling of the case, rather than an intentional desire to mislead the Court.

////

////

---

[83]Mr. Goldstein justified his actions by stating, "Mr. Lujano has a lot of trouble with English, and I have to communicate sometimes through somebody who knows English better." See 10/30/08 Transcript, Docket #293, at 112:24-113:1. Mr. Goldstein went on to testify, "Mr. Lujano has some trouble with English, and sometimes I communicated with Mr. Guerra who does speak English and does speak Spanish. . . . [Mr. Guerra] was also a witness to some of the events that are the subject of the adversary proceeding." Id. at 113:12-19. Mr. Goldstein also admitted that he doesn't remember whether he talked to Mr. Jaramillo directly when he sent documents to Mr. Jaramillo, through Mr. Guerra. Id. at 122:13-124:1.

[84]Mr. Goldstein's testimony at the OSC hearings appears to be inconsistent with his statement in his July 11, 2008 declaration, wherein he stated that Mr. Jaramillo and Mr. Lujano "have been my only contacts for Metricz." See Declaration of Samuel E. Goldstein in Response to the Court's May 15, 2008 OSC in Case No. 06-5127, Docket #82, at ¶ 10. In a later declaration, Mr. Goldstein attempted to rectify the inconsistency by disclosing that he communicated "from time to time with [Mr. Lujano and Mr. Jaramillo] through [Mr.] Guerra," and that he used Mr. Guerra as a courier to deliver declarations to Mr. Jaramillo. See Declaration of Samuel E. Goldstein re Communications with Robert Jaramillo in Case No. 06-5127, Docket #99, at ¶¶ 3, 8, 11, 15, 17, 18.

[85]Mr. Jaramillo denies this and claims that he never met Mr. Goldstein until shortly before the Mediation, in August of 2007. See 10/30/08 Transcript, Docket #293, at 105:6-12.

**C.    The Court's Authority to Sanction for Misconduct**

**1.    In General**

In general, the three vehicles available for a court to deter and sanction misconduct are found in Federal Rule of Bankruptcy Procedure 9011[86], 28 U.S.C. § 1927,[87] and 11 U.S.C. § 105(a)[88].  See Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (holding that bankruptcy courts have inherent powers to impose sanctions for a party's misconduct); Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 284 (9th Cir. 1996) (Congress' grant to bankruptcy courts of the inherent power to sanction improper conduct is codified by 11 U.S.C. § 105(a)); Brown v. Baden (In re Yagman), 796 F.2d 1165, 1184 (9th Cir. 1986), cert. denied, 484 U.S. 963 (1987) (stating that the "overriding purpose" of Rule 11 is deterrence); Beatrice

---

[86]Federal Rule of Bankruptcy Procedure 9011 provides, in pertinent part,

(b)    By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances –
    (1)  it is not being presented for any improper purpose[; and]
    . . . .
    (3)  the allegations and other factual contentions have evidentiary support[.]
    . . . .
(c)    If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may. . . impose an appropriate sanction upon the attorneys, law firms, or parties that. . . are responsible for the violation.

Fed.R.Bankr.P. 9011(b)(1) and (b)(3) and (c) (West 2010).

[87]28 U.S.C. § 1927 provides,

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

28 U.S.C. § 1927 (West 2010).

[88]Section 105(a) provides,

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (West 2010).

<u>Foods Co. v. New England Printing & Lithographing Co.</u>, 899 F.2d 1171, 1177 (Fed. Cir. 1990) (holding that a "principal purpose" of § 1927 is deterrence).

While various statutes and rules provide for the imposition of sanctions, a court's inherent powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 43 (citation omitted). Therefore, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power [to impose sanctions]." <u>Id.</u> at 50.

Here, neither a statute, nor the Federal Rules of Bankruptcy Procedure are "up to the task" of combating the bad faith exhibited by the parties. Federal Rule of Bankruptcy Procedure 9011 does not suffice. Mr. Guerra did sign a false declaration that was filed with the Court in connection with the sale, which stated that he had no connection with Metricz. Mr. Guerra, however, is not an attorney or an unrepresented party, as contemplated by that Rule. Thus, Rule 9011 is inapplicable. Similarly, 28 U.S.C. § 1927 does not suffice because a bankruptcy court is not a "court of the United States" in the Ninth Circuit. <u>Miller v. Cardinale (In re Deville)</u>, 361 F.3d 539, 546 (9th Cir. 2004) (citations omitted). Thus, the only remedy to redress the wrongs committed by the parties is the use of the Court's inherent powers.

### 2. The Court's Inherent Authority to Sanction under 11 U.S.C. § 105(a)

The court's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses. <u>See</u> <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 50-51 (affirming imposition of sanctions on an individual for conduct before other tribunals that constituted an abuse of process, even though the individual was not a party when the misconduct occurred); <u>In re Rainbow Magazine, Inc.</u>, 77 F.3d at 278 (upholding sanctions levied under the court's inherent powers against corporate debtor's principal who orchestrated the bad faith filing of the bankruptcy petition); <u>Corder v. Howard Johnson & Co.</u>, 53 F.3d 225, 232 (9th Cir. 1994) ("[E]ven in the absence of statutory authority, a court may impose attorney's fees against a nonparty as an exercise of the court's

inherent power to impose sanctions to curb abusive litigation practices") (citing <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764 (1980); <u>SECO Nevada v. McMordie (In re Holloway)</u>, 884 F.2d 476, 477 (9th Cir. 1989); <u>Moten v. Bricklayers, Masons and Plasterers Int'l. Union of America</u>, 543 F.2d 224 (D.C. Cir. 1976)).

This inherent power to impose sanctions extends to a "full range of litigation abuses[,]" including those where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when a party participates in an abuse of process or other dilatory conduct, or when the court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled." <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 46-47 (citations omitted); <u>In re Rainbow Magazine</u>, 77 F.3d at 284; <u>Fink v. Gomez</u>, 239 F.3d 989, 993-94 (9th Cir. 2001).

Before imposing sanctions under its inherent sanctioning authority, a court must make an explicit finding of bad faith or conduct that is tantamount to bad faith. <u>Knupfer v. Lindblade (In re Dyer)</u>, 322 F.3d 1178, 1196-97 (9th Cir. 2003) (citing <u>Fink v. Gomez</u>, 239 F.3d 989, 992-93 (9th Cir.2001)). The Court's inherent authority extends only to the imposition of compensatory sanctions, including those sanctions that make a party whole for expenses caused by the opponent's obstinacy. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 45-46; <u>In re Deville</u>, 361 F.3d at 547; <u>In re Dyer</u>, 322 F.3d 1178, 1198 (9th Cir. 2003); <u>Corder v. Howard Johnson & Co.</u>, 53 F.3d at 232. The court must also "exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." <u>In re Deville</u>, 361 F.3d at 545.

### 1. Joe Guerra

This entire proceeding was made necessary as a result of a single lie by Mr. Guerra - that neither he (as principal of Avon), nor Avon had any connection with Metricz. The length and expense of the proceeding was directly proportional to Mr. Guerra's continued bad faith refusal to tell the truth regarding the transaction. Despite his protestations to the contrary, the circumstantial and actual evidence surrounding the transaction indicate that he was intimately involved with Metricz and that he orchestrated the sale to, and purchase by, Metricz.

First, Mr. Guerra chose Mr. McClenehan to "market" the Property on behalf of the estate.

However, Mr. Guerra never took the steps that a true independent fiduciary would have taken. When he approached Mr. McClenehan about marketing the Property, Mr. Guerra provided only a rough idea of the details and did not provide a price range. He had only one or two conversations with Mr. McClenehan regarding the sale. He did not take any steps to ensure that the Property was shown to multiple individuals or was even listed for sale. He never asked Mr. McClenehan if the Property had been advertised and never personally showed the Property to anyone. There is no indication that he attempted to obtain the highest price, or even cared what that price was. In fact, Metricz's initial offer was $400,000, and it was not until Mr. Aguilar brought Mr. Sayles to the auction that the price increased to the final purchase price of $610,000. All of this indicates one of two things: (1) Mr. Guerra was not fulfilling his fiduciary duties; or more likely, (2) he was involved in the purchase of the Property, thus it was not necessary for him to follow the procedures that a debtor-in-possession would typically follow to ensure a sale at the best and highest price to an independent third party.

Second, despite signing a declaration in connection with the sale, which stated (under penalty of perjury) that he had no relationship to or connection with Metricz, and despite allowing Ms. Dumas to repeat that representation to the Court at the Sale Hearing, Mr. Guerra admitted at the OSC that he has known Mr. Hernandez (a Metricz shareholder) for ten years and that Mr. Hernandez has done work for Mr. Guerra in the past. The declaration signed by Mr. Hernandez indicated an even closer relationship; Mr. Guerra and Mr. Hernandez are friends and have shared a post office box "for many years." Thus, there was clearly a connection between Mr. Guerra and Metricz.

Third, the loan Application that was filled out by Mr. Lujano contained information regarding financial accounts belonging, not to Mr. Lujano, but to Mr. Guerra's son, Joe Guerra, Jr. Despite initially testifying that the accounts were his, Mr. Lujano eventually admitted that they were Joe Guerra, Jr.'s accounts and that Joe Guerra, Jr. was allowing Mr. Lujano to use the account information so that Mr. Lujano could qualify for a higher amount of financing.

Fourth, the initial $25,000 deposit for the purchase of the Property was paid not by Mr. Lujano, but by another of Mr. Guerra's sons, Curtis Guerra. Mr. Guerra tried to claim that the

$25,000 check from Curtis Guerra to Eagle Home Loans was an investment by Curtis in Mr. McClenehan's business. Mr. McClenehan adamantly denied that Curtis Guerra ever invested any monies in Eagle Home Loans and, after equivocating for an extended period, finally admitted that the check from Curtis Guerra was used for the initial down payment on the purchase of the Property.

Fifth, the required $100,000 deposit for the Purchase of the Property was also paid by Curtis Guerra. This, however, was only after Mr. Zlotoff realized that escrow had closed and was short by $118,000. Mr. Zlotoff demanded that Mr. Guerra turn over the funds and Curtis Guerra wrote a check for $100,000.

Sixth, Mr. Guerra continued to be involved in Metricz's affairs following the close of the sale. Specifically, after the Mediation concluded and the Trustee wrote Metricz a $25,000 check, Mr. Guerra accompanied Mr. Goldstein to Mr. Jaramillo's restaurant to have the check endorsed. Further, Mr. Goldstein used Mr. Guerra as a conduit to send Metricz documents and information to Mr. Jaramillo. In addition, Mr. Goldstein admitted that information for at least one Metricz declaration may have come from Mr. Lujano, and through Mr. Guerra. Finally, Mr. Jaramillo testified that Metricz mail began to be delivered to Mr. Salciccia's office in 2007 and that all Metricz mail that came to Mr. Salciccia's office was left for Mr. Guerra.

Mr. Guerra was clearly and intimately involved with Metricz and with Metricz's purchase of the Property. His misstatements in connection with the Sale Hearing and his subsequent lies at the OSC hearings wasted judicial time and resources and defiled the integrity of the bankruptcy system. Mr. Guerra's conduct was tantamount to bad faith. As a result, the Court intends to sanction Mr. Guerra under its inherent powers, in order to compensate the estate for the expenses incurred in uncovering his bad faith conduct. Thus, Mr. Guerra shall be jointly and severally liable, along with Mr. Lujano, Mr. Jaramillo and Mr. Goldstein (to the extent that Mr. Goldstein's liability is finally determined), for the fees and expenses incurred by the Trustee's counsel in investigating their conduct, bringing their misdeeds to the Court's attention, and participating in the OSC process. The exact amount of the judgment shall be determined following the submission of a fee application by the Trustee's counsel and a hearing by the Court

for reasonableness pursuant to 11 U.S.C. § 330.

### 2.  Raymundo Lujano

Mr. Lujano appears to have been simply a pawn in Mr. Guerra's plan to have Metricz purchase the Property.  Unfortunately for Mr. Guerra, Mr. Lujano knew little to nothing about the actual purchase, told stories of people who did not exist (i.e., Mr. de la Torre), and wove tales that were simply unbelievable (i.e., collecting $150,000 in "donations" and keeping the money in cash at his house).  In fact, no part of the web of lies spun by Mr. Lujano made any sense at all.  It is true that Mr. Lujano did not make any misrepresentations to the Court at the Sale Hearing itself.  Thus, he could have avoided sanctions entirely had he told the truth at the OSC.  Instead, he chose to act in bad faith, telling one implausible tale after another, all under penalty of perjury.

The biggest and most ridiculous of the fabricated stories presented by Mr. Lujano was of the existence of Mr. de la Torre.  Mr. Lujano claims that Mr. de la Torre was intimately involved in every aspect of the purchase; so much so that Mr. Lujano did not have to do anything and did not know anything.  Despite the alleged extensive participation in the sale by Mr. de la Torre, no one else involved in the sale and with Metricz has ever seen or spoken with him.  Further, the Court finds it unbelievable that Mr. Lujano would trust Mr. de la Torre, a man with no known residence or phone number, who only appeared at church periodically and went back and forth to Mexico, with $150,000 in cash, simply because Mr. de la Torre "was a man of God."

While the biggest fabrication was the existence of Mr. de la Torre, it was certainly not the only one.  Mr. Lujano claimed that he raised in excess of $150,000 in cash from friends at Christ the King church in San Jose.  These funds were described as "gifts."  However, Mr. Lujano had no proof of receipt of any cash, and no records of the alleged "donors."  In addition, despite the fact that Mr. Lujano had numerous bank accounts, he claimed that he kept the donated cash at his house, "because it was not his."  While he claims to have turned the funds over to Mr. de la Torre to be used to purchase his interest in Metricz and for Metricz to purchase the Property, he could not recall how much he turned over, in how many installments, and when.

Mr. Lujano also claimed that he did not know Mr. Guerra and had no connection with

him.  Mr. Lujano would like the Court to believe that all of his and Metricz's connections with Mr. Guerra are coincidence.  One or two events could constitute "coincidence."  Mr. Guerra's constant presence in the narrative, however, smacks of intentional design.

First, Mr. Lujano alleged that he "purchased" Metricz because Mr. de la Torre told him that was the best way to purchase property.  Mr. Lujano could have started his own corporation.  Instead, he purchased the corporation whose only member on the Board of Directors was Mr. Hernandez, a long-time friend of Mr. Guerra, who shared a post-office box with Mr. Guerra.

Second, while Mr. Lujano claimed that he made the down payments on the Property, the evidence is undisputed that both deposits came from Mr. Guerra's son, Curtis Guerra.

Third, of all the people in the world, Mr. Lujano hired Mr. Jaramillo to attend the Sale Hearing on behalf of Metricz.  Mr. Lujano claimed that it was Mr. de la Torre or Mr. McClenehan who suggested that Mr. Lujano hire Mr. Jaramillo.  Given that Mr. de la Torre is fictional[89] and Mr. McClenehan testified that he had not met Mr. Jaramillo until the OSC hearing, the Court is skeptical.  Again, however, the connection to Mr. Guerra is inescapable.  Mr. Jaramillo worked for Mr. Salciccia.  Mr. Salciccia was the agent for service of process for both Avon and Metricz.  Mr. Salciccia represented Mr. Guerra in various matters.  Mr. Jaramillo admitted to working on Mr. Guerra's file in at least one of those matters.  Mr. Guerra testified at his §341 meeting to working at Mr. Salciccia's office part time.  Mr. Jaramillo testified that when Metricz mail came to Mr. Salciccia's office, Mr. Jaramillo left it for Mr. Guerra.  While both Mr. Guerra and Mr. Jaramillo claimed that they knew each other only in passing, the connections between the two are too extensive to ignore.

Fourth, Mr. Lujano testified that the information on the Application was his, despite the fact that he later admitted that two of the accounts listed belonged to Mr. Guerra's son, Joe Guerra, Jr.

Fifth, of all the attorneys in the Bay Area, Mr. Lujano hired Mr. Goldstein to represent Metricz.  Mr. Lujano's story as to how he came to hire Mr. Goldstein was tortured, at best.

---

[89]or is possibly an alias for Mr. Guerra

Initially, he stated that he called information. Then, he agreed that he had looked in the Yellow Pages. Both stories are highly unlikely, given that Mr. Goldstein practices in Walnut Creek and Mr. Lujano was in San Jose. When pressed, Mr. Lujano claimed that either Mr. de la Torre or Mr. Jaramillo suggested the he call Mr. Goldstein. This excuse also rings hollow as Mr. de la Torre is fictitious and Mr. Jaramillo testified that he never met Mr. Goldstein until the Mediation. The connection to Mr. Guerra in this instance is, once again, inescapable as Mr. Goldstein had represented Mr. Guerra previously and may have been representing Mr. Guerra at the time.

Finally, in what the Court believes is no coincidence at all, after Metricz purchased the Property, Mr. Lujano entered into discussions with none other than Mr. Guerra, to develop the Property.

Mr. Lujano was a willing pawn in Mr. Guerra's scheme to purchase the Property from the estate. Mr. Lujano could have admitted as much. Instead, he insisted on telling lie after lie. His bad faith conduct and false testimony are not without consequence. His fabrications wasted judicial time and resources, forced the Trustee to conduct extensive investigation and incur significant expense, and violated the integrity of the bankruptcy system as a whole. Thus, the Court intends to sanction Mr. Lujano under its inherent powers, to compensate the estate for the expenses incurred in investigating and uncovering his bad faith conduct. As a result, Mr. Lujano shall be jointly and severally liable, along with Mr. Guerra, Mr. Jaramillo and Mr. Goldstein (to the extent that Mr. Goldstein's liability is finally determined) for the fees and expenses incurred by the Trustee's counsel in investigating their conduct, bringing it to the Court's attention, and participating in the OSC hearings. The exact amount of the judgment shall be determined following the submission of a fee application by Trustee's counsel and a hearing by the Court for reasonableness pursuant to 11 U.S.C. § 330.

### 3.    Robert Jaramillo

At the Sale Hearing, Mr. Jaramillo told Ms. Dumas that he had no connection with Mr. Guerra and allowed Ms. Dumas to repeat that representation and the representation that Metricz had no connection with Avon, to the Court. Mr. Jaramillo's evasive and untrue testimony at the

OSC hearing has convinced the Court that not only did Mr. Jaramillo lie under oath at the OSC hearing, but he also lied at the Sale Hearing. While Mr. Jaramillo would not admit to a prior relationship with Mr. Guerra or to knowing that Mr. Guerra was connected to Metricz and to the purchase of the Property, his testimony and actions indicate otherwise.

First, Mr. Jaramillo was an experienced attorney, having practiced in California for twenty-five years before resigning. He claims that Mr. Lujano contacted him, out of the blue, to represent Metricz at the Sale Hearing. The Court finds it odd that Mr. Jaramillo did not appear to think it was out of the ordinary for a stranger to contact him to represent an unknown corporation in a legal proceeding, claiming that he had never done it before, but had seen it done. The Court also finds it odd that an experienced lawyer did not require that anything regarding his services be memorialized in writing. Instead, Mr. Jaramillo wants the Court to believe that he agreed to represent a corporation that he knew nothing about, and a person whom he had not met and for whom he only had a phone number, in a legal proceeding, for $1,000 in cash.

Second, Mr. Jaramillo claims he took direction from Mr. Lujano, but Mr. Lujano lacked even the most basic knowledge regarding the sale. For example, Mr. Jaramillo testified at the OSC that he was told by Mr. Lujano that Mr. Jaramillo had authorization to bid up to $675,000 for the Property. Mr. Lujano, however, claims he never gave Mr. Jaramillo a specific amount. In addition, Mr. Jaramillo claimed that during a break at the Sale Hearing, he called Mr. Lujano to obtain the Pre-Sale Qualification Letter. Mr. Lujano, however, could not remember speaking with Mr. Jaramillo on the day of the sale, whether he had provided any paperwork to Mr. Jaramillo, or even whether the letter was prepared at his direction. Mr. Lujano's lack of knowledge regarding basic conversations that Mr. Jaramillo allegedly had with Mr. Lujano convinces the Court that Mr. Jaramillo's testimony on these points was less than truthful. More important, however, is the fact that Mr. Jaramillo refused to disclose who it was he was actually receiving direction from. The only explanation that makes sense is that Mr. Jaramillo was evasive because he wanted to distance himself from these proceedings and did not want to disclose that he was actually receiving his direction from Mr. Guerra, and/or he knew that Mr. Guerra was the individual orchestrating the Metricz's purchase of the Property from Avon.

53

Third, despite his testimony to the contrary, Mr. Jaramillo's activities on behalf of Metricz were more extensive than simply appearing at a single hearing. In fact, following the Sale Hearing in December 2005, Mr. Jaramillo represented Metricz at the Mediation, signed the settlement check as Metricz's President, and may have signed various declarations on behalf of Metricz. There was no reason to conceal these facts from the Court, except that Mr. Jaramillo did not want to reveal his connection to Mr. Guerra or Mr. Guerra's connection to Metricz.

Fourth, Mr. Jaramillo concealed the fact that Mr. Guerra accompanied Mr. Goldstein to Mr. Jaramillo's restaurant to sign the settlement check.

The most damning evidence, however, is not what Mr. Jaramillo refused to testify about, but what he actually testified to. Specifically, Mr. Jaramillo testified that when mail addressed to Metrciz came to Mr. Salciccia's office, Mr. Jaramillo would leave it for Mr. Guerra because Mr. Jaramillo just "knew" that Mr. Guerra was involved. Further, Mr. Jaramillo testified that "this is [Mr. Guerra's] M.O. He uses corporations to do, you know, develop properties and, you know, it just seemed to me that that was consistent with the way he did business." See 10/6/08 Transcript, Docket #289, at 190:24-191:2.

Mr. Jaramillo could have been forthright about his actions, motivations and connections. He chose not to, hoping that his vague and evasive testimony would end the inquiry. In the end, however, his bad faith failure to be truthful extended the time and expense of this proceeding exponentially. While Mr. Jaramillo may not have orchestrated the scheme for Mr. Guerra's engineered purchase of the Property, he participated in it and then lied about his participation. Thus, the Court intends to sanction Mr. Jaramillo under its inherent powers, to compensate the estate for the expenses incurred in investigating and uncovering his bad faith conduct. As a result, Mr. Jaramillo shall be jointly and severally liable, along with Mr. Guerra, Mr. Lujano and Mr. Goldstein (to the extent that Mr. Goldstein's liability is finally determined), for the fees and expenses incurred by the Trustee's counsel in investigating their conduct, bringing it to the Court's attention, and participating in the OSC hearings. The exact amount of the judgment shall be determined following the submission of a fee application by Trustee's counsel and a hearing by the Court for reasonableness pursuant to 11 U.S.C. § 330.

#### 4.    Samuel Goldstein

Mr. Goldstein was not named in this OSC.  He was, however, sworn in, and did testify.  While his testimony was limited, it clearly revealed that he was aware that Mr. Guerra was an agent of Metricz and that Mr. Goldstein treated him as such.  It also revealed that Mr. Goldstein lied to the Court about Mr. Guerra's involvement with Metricz, and, when caught, attempted to minimize Mr. Guerra's role as that of a "courier," in a continuing attempt to mislead the Court regarding Mr. Guerra's involvement.

Specifically, in a declaration dated July 11, 2008, Mr. Goldstein represented, under penalty of perjury, that Mr. Jaramillo and Mr. Lujano were his **only** contacts for Metricz.  This statement was false, as he later testified at the OSC that he would send documents, information and declarations intended for Mr. Jaramillo, through Mr. Guerra, because it was Mr. Guerra "who knew where Mr. Jaramillo could be located."[90]  He further testified that he could not remember whether he ever spoke with Mr. Jaramillo directly when he sent information and documents to Mr. Jaramillo through Mr. Guerra.

In addition, Mr. Goldstein claims that he had trouble communicating with Mr. Lujano because Mr. Lujano "ha[d] a lot of trouble with English."  Thus, Mr. Goldstein had to "communicate sometimes through somebody who [knew] English better."  That someone was Mr. Guerra.  Mr. Goldstein also admitted that information for at least one declaration "came indirectly from Mr. Lujano through Mr. Guerra."[91]

Finally, Mr. Guerra's participation in, and connections to, Metricz were made explicitly clear through the testimony that came out inadvertently; that Mr. Guerra accompanied Mr. Goldstein to Mr. Jaramillo's restaurant to obtain Mr. Jaramillo's signature on the Metricz

---

[90]Which begs the question as to why Mr. Goldstein could not locate his client, or could not simply ask Mr. Guerra how to get in touch with Mr. Jaramillo so that Mr. Goldstein could communicate directly with Mr. Jaramillo.  The only logical answer is that Mr. Guerra was not only acting as an agent for Metricz, but was likely also providing information and making decisions on behalf of Metricz.

[91]The Court is not clear what it means to have information "come indirectly from Mr. Lujano through Mr. Guerra." What is clear, however, is that Mr. Goldstein was relying on Mr. Guerra for translation services and for information, when Mr. Guerra was clearly and intimately involved and interested in Metricz and the Property.

settlement check. The Court can think of no reason why Mr. Guerra's presence was required, unless he was involved with Metricz. Further, the fact that Mr. Goldstein neglected to mention Mr. Guerra's presence tells the Court all it needs to know about Mr. Goldstein's attempts to hide Mr. Guerra's involvement.

Despite Mr. Goldstein's equivocation and attempts to explain away Mr. Guerra's constant presence in Metricz business, it is clear that Mr. Guerra was connected with Metricz and participated in Metricz business following the sale of the Property. Mr. Goldstein's statements to the contrary are simply false. Mr. Goldstein could have been honest and saved the Court and all of the parties significant time and expense. He chose not to and instead, chose to attempt to perpetuate the myth that Mr. Guerra was not involved. He was unsuccessful. Thus, the Court tentatively intends to sanction Mr. Goldstein under its inherent powers, to compensate the estate for the expenses incurred in investigating and uncovering his bad faith conduct. The Court also tentatively intends to hold Mr. Goldstein jointly and severally liable, along with Mr. Guerra, Mr. Lujano and Mr. Jaramillo for the fees and expenses incurred by Trustee's counsel in investigating their conduct, bringing it to the Court's attention, and participating in the OSC. To the extent that sanctions are finally levied, the exact amount of any judgment will be determined following the submission of a fee application by Trustee's counsel and a hearing by the Court for reasonableness pursuant to 11 U.S.C. § 330. Given that Mr. Goldstein was not a party to the OSC or the Amended OSC, however, due process requires the Court to give Mr. Goldstein an opportunity to respond. As a result, Mr. Goldstein shall have 30 days to respond in writing to this Memorandum and the proposed sanctions. The Court will take the matter under submission and issue a final decision following the expiration of the 30 days.

### 5. Stanley Zlotoff

Mr. Zlotoff was paid $3,520 for his work as Avon's counsel in this case. See Order Approving Application for Compensation, Docket #82. While his fees were low for a case of this size, his monitoring of the case was inadequate, and it was nothing more than pure luck that saved the estate from suffering significant losses. Perhaps the bigger problem, however, is the fact that Mr. Zlottoff's failure to monitor this case allowed Mr. Guerra to abuse the sale process

Case: 05-80243    Doc# 306    Filed: 07/30/10    Entered: 08/02/10 10:39:39    Page 56 of
67

and the bankruptcy system, and led directly to the issuance of the OSC and the time and expense attendant to it.

Mr. Zlotoff personally attended the Sale Hearing. He knew that there were questions regarding Metricz's disinterestedness and ability to purchase the Property. He was present for the extensive discussion on the record and for the specific conditions articulated by the Court to address the parties' concerns. He even prepared the Order that memorialized the conditions. Yet he failed almost entirely to comply with the most important conditions, while taking steps that could have caused grave harm to the estate.

Specifically, at the Sale Hearing, the Court stated that both the $25,000 deposit and the $100,000 deposit were to be payable to Mr. Zlotoff's trust account, in certified funds, by dates certain. See Transcript of 12/7/05 Sale Hearing, Docket #191, at 49:14-50:7. The Court asked whether the $100,000 deposit could go directly into escrow. Judge Grube declined, stating, "I want a way to verify this. I think the . . . hundred thousand dollars goes to you, to your trust account. . . . It's to be in certified funds into your trust account[.] And then I'll sign an order thereafter authorizing you to transfer the $125,000 to the title company. . . . If any of these things don't occur, there's a default under the terms and conditions of the purchase." Id. at 49:20-50:16. The Court went on to state, "Mr. Zlotoff, if there is a default you are **required** to declare a default. You are required to notify opposing counsel and Ms. Dumas." Id. at 56:12-14. Mr. Zlotoff's actions violated the Court's directives in multiple ways.

First, pursuant to the Sale Order, the initial non-refundable $25,000 deposit was to be made "in certified funds to the Stanley Zlotoff trust account by December 8, 2005, at 4:00 p.m." See Order Authorizing Sale Free and Clear of Interests, Docket #41, at 2:9-14. Mr. Zlotoff testified that he received the funds timely, but that he held them for approximately one month before depositing them in his trust account, because Mr. Guerra told Mr. Zlotoff that the Metricz's funding was in flux and there was an expectation that the check would be replaced by a different buyer or by different funding.

Second, and more disturbing, was Mr. Zlotoff's treatment of the second non-refundable deposit. The Sale Order provided that Metricz shall make a "$100,000 nonrefundable deposit in

certified fund to the Stanley Zlotoff trust account by January 9, 2006, at 4:00 p.m." Id. at 2:9-16. Mr. Zlotoff testified that Mr. Guerra brought the $100,000 check to Mr. Zlotoff's office on January 9, 2006. Instead of depositing the funds into his trust account, however, Mr. Zlotoff made a copy of the check, and returned the original to Mr. Guerra at Mr. Guerra's request because Mr. Guerra again told Mr. Zlotoff that Metricz was struggling, its funding was in flux and the check may have to be replaced by a different buyer or by different funding. When asked why, if Metricz was struggling and potentially on the verge of default, Mr. Zlotoff would have returned a $100,000 nonrefundable deposit to Mr. Guerra, Mr. Zlotoff could only state, "It was foolish. . . I just trusted that [Mr. Guerra] would see to the close of escrow." See 10/27/08 Transcript, Docket #292, at 85:22-86:2. Not only did Mr. Zlotoff risk Metricz ultimately not being able to come up with the funds for the purchase and the loss of a nonrefundable deposit, he also risked Mr. Guerra misappropriating those funds. The failure to comply with the Court's Order in this respect is utterly inexcusable.

Third, even after Mr. Guerra had indicated that Metricz might not be able to close the deal, Mr. Zlotoff failed to monitor the sale to ensure it complied with the Court's conditions and to ensure that the sale closed properly. In particular, on the day the sale closed, Mr. Zlotoff sent the title company instructions for disbursement of the remaining funds, despite the fact that he had not received and/or deposited the $100,000 nonrefundable deposit and despite the fact that he had not obtained an order authorizing transfer of the funds. His hollow explanation as to why he allowed the sale to close without accounting for the $100,000 was, "I didn't tell [Mr. Guerra] to keep the money himself. . . I believe that [the funds were] merely to be held pending close of escrow. I mean there's no reason it shouldn't have been accounted for by the close of escrow." Id. at 106:5-9. Yet, Mr. Zlotoff, as counsel for Avon, did not feel that the issue was important enough for him to personally account for the funds or for him to comply strictly with the Court's mandates. In fact, it was not until after the sale closed and Mr. Zlotoff received the closing statement and a check from the title company that he realized the sale was short by $118,000. It was only then that he contacted Mr. Guerra to obtain those funds. And it was only by pure luck that Mr. Guerra (through Curtis Guerra and Mr. McClenehan) was able to come up with the

missing funds.

Mr. Zlotoff's dismissive attitude toward the Court's directives, failure to comply with the Court's Order, and lax handling of this case allowed Mr. Guerra to abuse the sale process and the bankruptcy system, and led directly to the OSC and all of the time and expense attendant to it. Thus, for the foregoing reasons, and pursuant to its inherent powers, the Court intends to levy a sanction against Mr. Zlotoff in the form of disgorgement of the entire $3,520 that he has been paid in this case, as compensation to the estate for the attorney fees incurred by Trustee's counsel in investigating and uncovering the bad faith conduct that resulted, in part, from Mr. Zlotoff's lax handling of this case. The $3,520 in disgorged fees will be applied to the fees and expenses awarded to Trustee's counsel, following an application and hearing for reasonableness under 11 U.S.C. § 330 and will correspondingly reduce the amount of the joint and several liability of Mr. Guerra, Mr. Lujano, Mr. Jaramillo and Mr. Goldstein (to the extent that Mr. Goldstein's liability is finally determined).

### 6. James McClenehan

The Court has found no evidence that Mr. McClenehan made any direct and knowing misrepresentations to the Court regarding the sale, or caused to be filed with the Court any papers that contained knowing misrepresentations. Further, even though Mr. McClenehan testified that he knew that Debtor was in bankruptcy when the Property was being sold and it was apparent to the Court that Mr. McClenehan was knowingly attempting to hide the true source of the funds used for the non-refundable deposits and, the Court has uncovered no evidence that Mr. McClenehan ever was informed of, or knew of the requirement that any bankruptcy sale was required to be an arms length transaction, or knew of the significance of his actions. Further, he did not attend the Sale Hearing, thus he was not privy to the discussions that occurred on the record, nor is there any evidence that he was informed of the Court's concerns regarding a potential connection between Metricz and Debtor.

Having said that, Mr. McClenehan was unnecessarily evasive in some of his answers, especially in response to questions regarding the source of the two deposits. His evasiveness added to the time and expense of this proceeding. Balancing out his evasiveness, however, is the

fact that he was one of the only participants to this hearing that produced documents in response to the Court's inquiries and testified numerous times in response to other parties' testimony. Given that Mr. McClenehan was one of the only semi-willing participants to this proceeding, the Court finds that sanctions under the Court's inherent powers are inappropriate.

The problem, however, is that Eagle Home Loans received a sales commission as the broker for the seller; i.e., Avon.

Section 327 of the Bankruptcy Code provides, in pertinent part, that a trustee, "with the court's approval, may employ one or more . . . professional persons. . . to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). Section 327 applies to debtors in possession by virtue of § 1107(a).[92]

A real estate broker is a "professional person" as contemplated by § 327. In re Silver Oak Homes, Ltd., 167 B.R. 389, 398 (Bankr. D.Md. 1994); In re McConnell, 82 B.R. 43, 44 (Bankr. S.D. Tex. 1987); In re Eastern Inns of New Hampshire, Inc., 72 B.R. 418, 420 (Bankr. D. Me. 1987); In re Roberts, 58 B.R. 65, 67 (Bankr. D.N.J. 1986). A real estate broker is not entitled to a commission on the sale of estate property where his employment was not approved by the Bankruptcy Court. In re Haley, 950 F.2d 588, 590 (9th Cir. 1991); Enea v. Coldwell Banker/Del Monte Realty, 225 B.R. 715, 719 (N.D. Cal. 1998).

The Court finds that Eagle Home Loans was clearly acting as the broker on behalf of the Debtor. It was Mr. Guerra who approached Mr. McClenehan about finding a buyer.[93] Mr. McClenehan allegedly mentioned the Property to people with whom he came into contact. It was one of Mr. McClenehan's contacts that allegedly found Mr. Lujano. Mr. Lujano claimed

___

[92]Section 1107(a) provides, in pertinent part,

Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights. . . and powers, and shall perform all the functions and duties. . . of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a).

[93]This, at least, was the story advanced by the parties, even though it was clear to the Court that Mr. Guerra had pre-arranged to have Metricz and/or Mr. Lujano purchase the Property.

that it was Mr. Jaramillo, not Mr. McClenehan, that represented Mr. Lujano in the sale

transaction and appeared to be unaware of Mr. McClenehan's actions, or the fact that they were

allegedly

performed on Mr. Lujano's behalf.[94]  Mr. McClenehan testified that he took instruction from Mr.

Zlotoff (Debtor's counsel) regarding the deposits required for the sale.  Mr. McClenehan's

actions were consistent with the Seller Estimated Closing Statement, which indicated that Eagle

Home Loans was paid the commission as the "Listing Broker," and were also consistent with his

receipt and retention of the commission on behalf of Avon.[95]

       Mr. McClenehan claimed that he intended to refer the commission to Mr. Hernandez.

The Court is not persuaded.  Mr. McClenehan testified that he never actually gave Mr.

Hernandez the commission check.  Mr. Hernandez's declaration, which was obtained by Mr.

McClenehan, never mentioned a request that the commission be paid to him or to anyone on his

---

[94]Mr. Tate: "Sir, after you decided to purchase the property. . . then you hired Mr. McClenehan as your real estate agent, correct?"
    Mr. Lujano: "Is that the agent who does the loan for you, or what?"
    Mr. Tate: "Well, there is a difference.  Let me clarify it for you.  As for the transaction of purchasing the property, **did Mr. McClenehan represent you on the purchase of the property itself?**"
    Mr. Lujano: **"No. It was Mr. Jaramillo."**
    Mr. Tate: "Do you know that Mr. McClenehan earned an $18,000 sales commission as your real estate agent?"
    Mr. Lujano: "I don't understand that.  Could you repeat it, please?"
    Mr. Tate: "Sure.  You've purchased property before?"
    Mr. Lujano: "Yes."
    Mr. Tate: "And you have purchased property with real estate agents representing the seller and buyer, correct?"
    Mr. Lujano: "Yes."
    Mr. Tate: "And you understand that real estate agents, whether they be for the buyer or the seller, oftentimes receive a percentage of the sales price as a commission?  That's how they earn their money?"
    Mr. Lujano: "Yeah, I guess so."
    Mr. Tate: **"Did you know that Mr. McClenehan was earning an $18,000 commission as your agent for the purchase of the [Property]?"**
    [Mr. Goldstein's objection is overruled by the Court.]
    Mr. Lujano: "Well, you're telling me that when somebody acts as an agent that's the way they get paid.  And so in this case **if he acted on my behalf, I guess he got paid that way."**
See 9/10/08 Transcript in Case No. 06-5127, Docket #145, at 39:18-41:1 (emphasis added).

[95]The Court acknowledges that Mr. McClenehan did not do many of the things that a professional would be required or expected to do on behalf of a bankruptcy estate (i.e., find out critical details regarding the Property, market the Property, list it on the MLS, etc.)  Just because he did not do his job well does not mean, however, that he was not acting on behalf of the estate.  The Court finds that the totality of the circumstances reveal that he was, in fact, acting as the estate's broker.

behalf, nor did it mention actual receipt of the commission. More persuasive, however, is the fact that Mr. McClenehan never actually referred the commission to anyone. Mr. McClenehan remained in possession of the commission until well after the close of escrow. It was not until Mr. Zlotoff required Mr. Guerra to turn over the escrow shortfall that Mr. McClenehan parted with the funds. Mr. McClenehan argued that his payment of the commission to Mr. Zlotoff was, in fact, a referral fee, and that the Court would have to trace it from Mr. Zlotoff's account to see where it went. That argument is disingenuous and misses the point. That Mr. McClenehan ultimately decided to funnel those funds back into the purchase of the Property does not negate the reality that the funds were paid to Eagle Home Loans, kept by Mr. McClenehan, and Mr. McClenehan ultimately decided where they went. The Court also notes that while Mr. McClenehan ultimately used $18,000 of the commission for the purchase of the Property, there is no evidence that he ever parted with the remaining $300 of the commission. The fact that he was able to determine how much to part with and how much to keep, supports the Court's conclusion that Eagle Home Loans received the commission as Avon's agent.

Neither Eagle Home Loans nor Mr. McClenehan were ever employed by the Bankruptcy Estate, and Eagle Home Loans' receipt of a commission on behalf of the estate was improper. Thus, for the foregoing reasons, the Court tentatively finds that Eagle Home Loans improperly received the $18,300 commission and that those funds should be disgorged to the Bankruptcy Estate. Given, however, that the OSC warned Mr. McClenehan only of the possibility of sanctions under the Court's inherent powers, and not under 11 U.S.C. § 327 or its related case law, due process requires the Court to give Mr. McClenehan and Eagle Home Loans an opportunity to respond. As a result, Mr. McClenehan and Eagle Home Loans shall have 30 days to respond in writing to this Memorandum and the proposed disgorgement. The Court will take the matter under submission and issue a final decision following the 30 days.

## IV.    **CONCLUSION**

The tales woven by Mr. Guerra, Mr. McClenehan, Mr. Lujano, Mr. Jaramillo and Mr. Goldstein were complicated, inconsistent, and in many respects, unbelievable. The one common thread, however, was Mr. Guerra, as all of these parties and their actions lead back to him.

While Mr. Guerra clearly controlled Metricz and orchestrated the sale and purchase of the Property, he had a lot of help from Mr. Lujano, Mr. McClenehan, Mr. Jaramillo, and Mr. Goldstein, all of whom actively and continuously attempted to conceal the true facts surrounding the sale from this Court. Mr. Guerra's control over Metricz and all aspects of the sale and purchase of the Property was also unknowingly aided by Mr. Zlotoff, who appears to have set aside his professional judgment and abdicated his fiduciary duties to the estate and as an officer of the Court. The end result was a grave harm to the Bankruptcy Estate by virtue of the fact that the Trustee and his counsel were required to spend large amounts of time and money in attempting to figure out exactly what happened. Perhaps the bigger concern, however, was the violence committed by the parties against the integrity of the bankruptcy system. For these and the following reasons, the Court intends to utilize its inherent powers to sanction the parties and to compensate the estate for the losses it has suffered as a direct result of the parties' obstructive actions. Specifically,

1/ Sanctions will be levied against Mr. Guerra, Mr. Lujano and Mr. Jaramillo, under the Court's inherent powers, to compensate the estate for the expenses incurred in investigating and uncovering their bad faith conduct. Mr. Guerra, Mr. Lujano and Mr. Jaramillo shall all be jointly and severally liable for the fees and expenses incurred by Trustee's counsel in investigating their conduct, bringing it to the Court's attention, and participating in the OSC. The exact amount of the judgment shall be determined following the submission of a fee application by Trustee's counsel and a hearing by the Court for reasonableness pursuant to 11 U.S.C. § 330;

2/ Sanctions will be tentatively levied against Mr. Goldstein to compensate the estate for the expenses incurred in investigating and uncovering his bad faith conduct. The Court also tentatively intends to hold Mr. Goldstein jointly and severally liable, along with Mr. Guerra, Mr. Lujano and Mr. Jaramillo for the fees and expenses incurred by Trustee's counsel in investigating their conduct, bringing it to the Court's attention, and participating in the OSC. To the extent that sanctions are finally levied, the exact amount of any judgment will be determined following the submission of a fee application by Trustee's counsel and a hearing by the Court for

reasonableness pursuant to 11 U.S.C. § 330.  Mr. Goldstein shall have 30 days to respond in writing to this Memorandum and the proposed sanctions.  The Court will take the matter under submission and issue a final decision following the expiration of the 30 days; and

     3/    A sanction in the form of disgorgement of the entire amount of the $3,520 in fees that Mr. Zlotoff was paid for this case will be levied against Mr. Zlotoff, as compensation to the estate for the attorney fees incurred by Trustee's counsel in investigating and uncovering the bad faith conduct that resulted, in part, from Mr. Zlotoff's lax handling of this case.  The $3,520 in disgorged fees will be applied to the fees and expenses awarded to Trustee's counsel, following an application and hearing for reasonableness under 11 U.S.C. § 330, and will correspondingly reduce the amount of the joint and several liability of Mr. Guerra, Mr. Lujano, Mr. Jaramillo and Mr. Goldstein (to the extent Mr. Goldstein's liability is finally determined).

     In addition to the above, pursuant to 11 U.S.C. § 327, the Court tentatively finds that Eagle Home Loans improperly received the $18,300 commission and that those funds should be disgorged to the Bankruptcy Estate.  Eagle Home Loans and Mr. McClenehan shall have 30 days to respond in writing to this Memorandum and the proposed disgorgement.  The Court will take the matter under submission and issue a final decision and order after expiration of the 30 days.

     An appropriate Order shall issue.

1

<u>Court Service List</u> [by mail and ECF]

2
3

Joe Guerra
Guerra & Associates
P.O. Box 609
San Jose, CA 95106

4
5
6

Metricz Corporation
3033 Moorepark
Suite 7
San Jose, CA 95118

7
8

Samuel E. Goldstein
Samuel E. Goldstein and Assoc.
1777 Botelho Dr. #345
Walnut Creek, CA 94596

9
10
11

Robert Jaramillo
c/o Law Offices of Thomas Salciccia
870 North First Street
San Jose, CA 95112

12
13

Raymundo Lujano
265 North 26th Street
San Jose, CA 95116

14
15

James McClenehan
Eagle Home Loans
1190 Park Avenue
San Jose, CA 95126

16
17
18

James Roberts
ROBERTS & ELLIOTT, LLP
Ten Almaden Boulevard
Suite 500
San Jose, CA 95113

19
20
21

Perry J. Woodward
Terra Law, LLP
177 Park Avenue, 3rd Floor
San Jose, CA 95113

22
23

Luis Aguilar
P.O. Box 21889
San Jose, CA 95151

24
25

Patrick E. Marshall
Law Offices of Patrick E. Marshall
345 5th St. #4
Hollister, CA 95023

26
27

Clifford W. Stevens
Law Offices of Neumiller and Beardslee
P.O. Box 20
Stockton, CA 95201-3020

28

1 | Avon Townhomes Venture
P.O. Box 609
2 | San Jose, CA 95106

3 | Stanley A. Zlotoff
Law Offices of Stanley A. Zlotoff
4 | 300 S 1st St. #215
San Jose, CA 95113

5 | Mohamed Poonja
P.O. Box 1510
6 | Los Altos, CA 94023-1510

7 | Kevin W. Coleman
Schnader Harrison Segal and Lewis LLP
8 | One Montgomery St. #2200
San Francisco, CA 94104

9 |
Suzanne Decker
10 | 1271 Washington Ave. #318
San Leandro, CA 94577
11 |

12 | Reidun Stromsheim
Stromsheim & Associates
13 | 201 California Street, Suite 350
San Francisco, CA 94111

14 |
Nanette Dumas
15 | Office of the U.S. Trustee
280 S 1st St. #268
16 | San Jose, CA 95113

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# Notice Recipients

District/Off: 0971−5          User: psung          Date Created: 8/2/2010
Case: 05−53243               Form ID: pdfeoc       Total: 18

**Recipients of Notice of Electronic Filing:**
intp    Suzanne L. Decker       suzannedecker@sbcglobal.net
tr      Mohamed Poonja          mpoonja@sbcglobal.net
aty     Kevin W. Coleman        kcoleman@schnader.com
aty     Nanette Dumas           nanette.dumas@usdoj.gov
aty     Reidun Stromsheim       rstromsheim@stromsheim.com
aty     Samuel E. Goldstein     sgoldstein@segoldlaw.com
aty     Stanley A. Zlotoff      zlotofflaw@gmail.com

                                                              TOTAL: 7

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db      Avon Townhomes Venture       P.O. Box 609       San Jose, CA 95106
rspi    Joe Guerra      P.O. Box 609       San Jose, CA 95106
cr      Metricz      3033 Moorepark       Suite 7       San Jose, CA 95118
        Robert Jaramillo       c/o Law Offices of Thomas Salciccia       870 North First Street       San Jose, CA 95112
        Raymundo Lujano       265 North 26th Street       San Jose, CA 95116
        James McClenehan       Eagle Home Loans       1190 Park Avenue       San Jose, CA 95126
        James Roberts       ROBERTS &ELLIOTT, LLP       Ten Almaden Boulevard       Suite 500       San Jose, CA 95113
        Perry J. Woodward       Terra Law, LLP       177 Park Avenue, 3rd Floor       San Jose, CA 95113
        Luis Aguilar       P.O. Box 21889       San Jose, CA 95151
        Patrick E. Marshall       Law Offices of Patrick E. Marshall       345 5th St. #4       Hollister, CA 95023
        Clifford W. Stevens       Law Offices of Neumiller and Beardslee       P.O. Box 20       Stockton, CA 95201−3020

                                                              TOTAL: 11